SAUNDERS et al. v. NEW YORK CENT. & H. R. R. CO.

(Supreme Court, Special Term, Westchester County. April 5, 1893.)

1. RIPARIAN OWNER—RIGHT TO ACCRETIONS.
   Accretions caused by the filling of the shallow waters of a navigable bay or river belong to the riparian owner.
2. SAME—TITLE TO BED OF PUBLIC WATERS—AUTHORITY OF STATE TO GRANT.
   The state holds the title to the soil under navigable waters in trust for the public, for specific purposes, and cannot grant the same to a trading corporation, so as to interfere with the free navigation of the waters over them, or access thereto by riparian owners.
3. SAME—RAILROAD RIGHT OF WAY—GRANT FROM STATE.
   Where a railroad is constructed across a navigable bay, and the bay is filled from the shore to such railroad, partly by the riparian owners, and partly by the railroad company, so as to exclude the waters therefrom a grant from the state to such company of the land which originally formed the bed of the bay, for right of way purposes, is unavailing, as against the right thereto of such riparian owners.

Action by Leslie M. Saunders and Alexander Saunders against New York Central & Hudson River Railroad Company to restrain defendant from operating its railroad over a parcel of land formerly under the waters of the Hudson river, and to compel the removal of its tracks therefrom. Judgment for plaintiffs.

In 1846 the Hudson River Railroad Company was incorporated, and authorized to build and operate a railroad from New York city to Albany along the easterly shore of the Hudson river, and to cross the bays or waters of the river with their tracks. At that time, Ethan Flagg was the owner of the shore and upland now owned by the plaintiff, and in front thereof was one of the bays crossed by the railroad. In 1847, Flagg, by his deed, conveyed to the railroad company his rights in a parcel of land 70 feet wide, on which

the railroad tracks were laid, reserving to himself all the right in the river which he had, save within the parcel sought to be conveyed, and which par· ·cel of land was all under the water of the river, and had never been granted by the state to Flagg. In the deed the railroad company covenanted to con- :struct a way for Flagg and his grantees across the railroad to any wharf, whenever built. The railroad being built, there was left a strip of land about 100 feet wide between the shore and the parcel conveyed to the railroad. This strip of land was bare mud at low tide, but was, at high tide, covered with water, which came from the river through a culvert under the railroad ·embankment, through which culvert only a small rowboat could pass, and such a boat only at half tide. In 1853, Flagg· having sold the shore, his .grantees of the shore pulled down the bluffs on the shore, and filled in the ·strip from the shore to the railroad embankment, wholly excluding the water ·of the river. From 1869 to 1883 the filled-in land was an open passage, and ·a thoroughfare for all persons and teams choosing to pass. In 1868 the Hud- son River Railroad Company filed a map, and thereby laid claim to the strip ·of filled-in land in question, for an addition to its accommodation, but took no steps to make other title thereto until 1873, when the commissioners of the land office of the state of New York, in the name of the people of the ·state, granted to the New York Central & Hudson River Railroad Company, ·successor of the Hudson River Railroad Company, a patent of land on each side of the railroad, 98 miles in length, between New York city and East Albany, of varying widths,—of 150 feet, 100 feet, and 80 feet in width at dif- ·ferent points,—and all thereof formerly, and most thereof still, under the wa- ters of the river, and including the strip of land in question, filled in by Flagg's grantees. In 1883 the defendant laid one switch track on the filled-in 'land in question, and in 1888 laid another switch track thereon, which switch tracks, and the standing and moving of cars thereon, are obstructions to plain- tiffs' claimed right to cross from the original upland and shore of Flagg, now owned by them, to the navigable waters of the Hudson river. The plain- tiffs have not, nor had their grantors, any grant from the state of the filled-in 'land in question, but as the owners of the original upland to old high-water mark, and as the owners, by patent from the state, of lands west of the rail- road out to the pier head line established by law.

Ralph E. Prime, for plaintiffs.

Rumsey v. Railroad Co., 133 N. Y. 79, 30 N. E. Rep. 654; Proud. Dom. Pub.; ·37 Amer. Jur. 121; 2 Kent, Comm. 339, note; Phear, Water, 46; Ang. Tide Waters, 17, 18, 135, 150; Illinois Cent. R. Co. v. State of Illinois, 13 Sup. ·Ct. Rep. 110; Smith v. Levinus, 8 N. Y. 472; 1875 Sen. Doc. No. 37, opinion of Pratt, attorney general; Stockton v. Railroad Co., 32 Fed. Rep. 19; Martin v.· Waddell, 16 Pet. 414; Providence Steam-Engine Co. v. Providence & S. S. S. ·Co., 12 R. I. 348; Corp. Jur. Civ. Dig. L. 43, tit. 15, § 1; Id. tit. 88; Ang. Tide- Waters, cc. 7, 8; Duke of Buccleuch v. Board, L. R. 5 H. L. 418; Bell v. Gough, 23 N. J. Law, 624; Burrows v. Gallup, 32 Conn. 493; Doane v. Associ- ation, 6 Mass. 333; Mill Corp. v. Newman, 12 Pick. 467; Lapish v. Bank, 8 Greenl. 85; Ball v. Slack, 2 Whart. 508; Rice v. Ruddiman, 10 Mich. 125; Com. ·v. Shaw, 14 Serg. & R. 9; Harrison v. Sterett, 4 Har. & McH. 540; Yates v. Milwaukee, 10 Wall. 497; Kane v. Railroad Co., 125 N. Y. 164, 26 N. E. Rep. 278; Story v. Railroad Co., 90 N. Y. 122; Steers v. City of Brooklyn, 101 N. Y. 51, 4 N. E. Rep. 7; In re City of Yonkers, 117 N. Y. 574, 23 N. E. Rep. 661; Rumsey v. Railroad Co., 114 N. Y. 423, 21 N. E. Rep. 1066; Railroad Co. v. Aldridge, 135 N. Y. 83, 32 N. E. Rep. 50; Langdon v. Mayor, etc., 93 N. Y. 152; Sess. Laws 1850, c. 140, §§ 44, 49; Id. 1892, c. 676, § 32; Smith v. Railroad Co., ·63 N. Y. 58; Wademan v. Railroad Co., 51 N. Y. 568; Wheeler v. Railroad Co., 12 Barb. 227; Clarke v. Railroad Co., 18 Barb. 353; Henderson v. Railroad Co., '78 N. Y. 430; Corning v. Nail Factory, 40 N. Y. 191.

Ira A. Place, for defendant.

People v. Commissioners of Land Office, 135 N. Y. 447, 32 N. E. Rep. 139; 'Blakslee Manuf'g Co. v. Blakslee Sons Iron Works, 129 N. Y. 155, 29 N. E. 'Rep. 2; Kerr v. Railroad Co., 127 N. Y. 269, 27 N. E. Rep. 833; People v. Kerr,

27 N. Y. 188; Kellinger v. Railroad Co., 50 N. Y. 209; Mahady v. Railroad Co., 91 N. Y. 148; Fobes v. Railroad Co., 121 N. Y. 505, 24 N. E. Rep. 919; Lansing v. Smith, 8 Cow. 146; Mayor, etc., v. Hart, 95 N. Y. 443.

DYKMAN, J.    The plaintiffs in this action are upland owners on the east bank of the Hudson river, at Yonkers. The Hudson River Railroad Company was incorporated as a body politic and corporate by a special law in May, 1846, with power to construct and operate a railroad from New York to Albany. At that time, Ethan Flagg was the owner of the upland now belonging to the plaintiffs, and there was a small bay in front of the land, across which the railroad was projected; and Ethan Flagg gave a deed of conveyance to the railroad company August 13, 1847, for a strip of land 73 feet wide and 1,037 feet in length. The Hudson River Railroad Company constructed its road across the bay upon the land covered by the deed from Ethan Flagg. Thereafter the Hudson River Railroad Company became consolidated with the New York Central Railroad Company, under the name of the New York Central & Hudson River Railroad Company. Subsequent to such consolidation the defendant made a filling on the east side of the strip included in the Flagg deed, and in 1882 laid down a railroad track east of the original track, and in 1888 laid down another track, still further east, and both these tracks extend along the whole front of the plaintiffs' upland. At this time the whole of the bay from the original high-water line west to the original railroad embankment is all filled in with earth so as to exclude the water. Some of that filling was made by the defendant, and some by the owners of the upland. The precise quantity of filling done by each is not stated definitely. Since the two extra tracks were laid down, they have been used by the defendant in its business. Its yard is there, and large cars are run there, and remain upon the tracks for different periods of time. This action is brought to restrain such use, and compel the removal of the two tracks so laid down east of the original roadbed of the defendant, and in front of the upland of the plaintiffs. In December, 1873, the defendant obtained from the commissioners of the land office letters patent for a grant of land under water on both sides of the original bed of the Hudson River Railroad from New York to Albany, containing many thousands of acres of land, and including the land upon which the two tracks above mentioned were laid. These are the substantial and basal facts upon which the questions involved in this action are to be determined. The questions are interesting, but intricate, and their examination affords a wide scope for research, and requires careful discrimination and analyzation.

It will be orderly to determine first the rights of the plaintiffs as riparian or littoral proprietors, and that inquiry can now proceed without embarrassment from the case of Gould v. Railroad Co., 6 N. Y. 522, which, after repeated attacks from flank and rear, has now received an assault in front from the court of appeals, and been overthrown. Rumsey v. Railroad Co., 133 N. Y. 80, 30 N. E. Rep. 654. This case can therefore be determined in the light of

authority, upon principles more consonant with reason and justice. The rights of riparian proprietors to the water flow from the contiguity of their land thereto. They have the right of access to the navigable part of the river from the front of their land; the right to make a landing or wharf, subject to the rights of the public; the right of fishing and landing, and of accretion. Yates v. Milwaukee, 10 Wall. 497. They may also fill up shallow water in their front, and upon such reclaimed land construct wharves, so long as they do not infringe upon the rights of navigation. Dutton v. Strong, 1 Black, 23. Under the civil law they might project a mole in the sea. These rights and privileges constitute property which is under the protection of the constitution and the laws, and which cannot be impaired or destroyed without compensation. In this case the right of accretion is important, because the rule is the same whether the accretion is natural or wrongful; whether it results from natural causes, or the work of man. Steers v. City of Brooklyn, 101 N. Y. 56, 4 N. E. Rep. 7. Justice can be done to the littoral owner in no other way. Accretion, whether natural or wrongful, must belong to the upland owner, or he will be excluded from the water, and changed into an inland, instead of a riparian, owner, without his assent. If that rule of law enunciated in the Steers Case is applicable here, it is difficult to see why the accretion in front of the upland of the plaintiffs did not vest in them, and their predecessors in title. If the wrong construction of a wharf in front of the old shore, in that case, was viewed as accretion, which went to the riparian proprietor because it was between him and the river, it is difficult to see why the filling in here should not have the same result, and accrue to the benefit of the upland owners. In each case the access of the owner is similarly affected, and unless his rights are extended to the new shore he is converted into an inland owner, and deprived of the important and valuable rights of a littoral owner, without compensation. In the case of Ledyard v. Ten Eyck, 36 Barb. 126, the defendant owned the land on the east shore of Cazenovia lake, in this state, and the canal commissioners excavated the outlet, and deposited the material in the shallow water in front of his premises. The defendant took possession of the reclaimed land. The court said the trusteeship of the state, both for the public and the landowner, was at an end, and the land became necessary for the beneficial enjoyment of the upland, and thus arose, if not a legal, at least a strong equitable, title, which, with the possession, should not be disputed, except by the state itself. That case favors the contention of the plaintiff. I think the doctrine of the Steers Case is applicable to this, and that the right of access of the plaintiffs is extended to the new shore formed by the railroad. I intend to rest my decision, on this branch of the case, upon the right of the plaintiffs as riparian proprietors, independent of the rights they may have as owners of the land under water west of the railroad.

The defendant contends that the plaintiffs' right of access to the river was terminated or limited by the execution and delivery

of the deed from Flagg to the railroad company for the strip of land across the bay, but the deed can have no such operation. At most, that deed conveyed that strip of land, and that only for the use of the road, for the purposes expressed in its charter, and the grantor surrendered none of his rights, with which he was clothed as upland owner. Railroad Co. v. Aldridge, 135 N. Y. 83, 32 N. E. Rep. 50. Moreover, the grantor reserved to himself, and his heirs and assignees, all his and their rights to the land below high-water mark, except the strip so conveyed; and unlike the reservation which was condemned in the Blakslee Case because the right is regarded as appurtenant to the land, and cannot exist if severed from the ownership thereof, this reservation was valid, because the grantor remained the owner of the upland, and reserved the right as appurtenant thereto. The case of Duke of Buccleuch v. Board, L. R. 5 H. L. 418, was this: The duke of Buccleuch was the owner of land on the bank of the river Thames, through which a road was constructed along the shore of the river, under an act of parliament, which cut off his access to the river; and it was decided by the house of lords that he was entitled to compensation, not only for the land actually taken for the construction of the public road, but also for the permanent damage to the whole property in consequence of its change from riverside to roadside property, including his particular right to use the shore of the river. That case seems to be a direct authority in favor of the plaintiffs here.

The defense to this action is based upon the right bestowed upon the Hudson River Railroad Company by chapter 30 of the Laws of 1848 to alter its line, and file a new map, and acquire the land embraced in the new location, the filing of such new map, and the grant from the commissioners of the land office in 1873. It is to be said of this grant, preliminarily, that it was for railroad purposes only, and the company could take it for no other purpose; and Judge Brown, in his opinion in the first Rumsey Case, 114 N. Y. 432, 21 N. E. Rep. 1066, took pains to show adequate provision was made to give every upland owner easy access to the water, and preserve to such owners their access to the river.

There are, however, other reasons why this grant can have no operation which will abridge the rights of riparian owners along the east bank of the Hudson river. By the common law of England the title to the soil under navigable waters was in the crown, and the control over such waters rested in the British parliament; but by the Revolution, and the separation of the states from the crown, the title to the bed of navigable waters, which before that rested in the crown, was transferred to the people of the state, by the Revolution, as the successor of their former sovereign. At the same time the people, in their sovereign capacity, became vested with the absolute control over rivers which before rested in the British parliament, but surrendered the power to regulate commerce and navigation to the congress of the United States, in 1778, by the adoption of the federal constitution. So that now, through their legislature, the

people may exercise all the power over navigable waters, and the soil upon which they lie, which could have been exercised by the king, in conjunction with parliament, previous to the Revolution, subject to the restrictions imposed by the constitution of the United States, and no more.

We must now inquire what those powers of the crown and parliament were. It was determined in England, at a very early period, that the title to property in the soil under tide waters was vested in the king, as the representative of the public, for the public use; and after Magna Charta, at least, he never had the authority to make an exclusive grant in an arm of the sea. It was laid down by Bracton that those things which related particularly to the public good could not be sold, and that rule was based upon principles of public policy. The sea and the navigable rivers are the natural highways of the world, and, although the sovereign may make grants of the soil for certain purposes, yet such grants are subject and subordinate to the paramount right of the public, and there is even an implied reservation of such public right in all such grants. As the people of the state succeeded to the rights of the king and parliament, they took no greater rights. The distinction is between the "domain of the state," which is the property of which the people have the absolute estate, like an individual, and the "public domain," which the state holds as a mere trustee for the use of the public, and "which remains in the state of primitive individision." 2 Kent, Comm. 339. The former applies to things in which the state has an absolute property, and the latter to the property which the state holds as trustee for the public, such as highways and navigable streams. In the latter case the state holds only "a regulating power, for the purposes of protecting the public in the use of the waters for navigation, and other public purposes, and of this power and duty of regulation the state cannot divest itself." "It is equally true that the riparian proprietors have certain rights and interests which are valuable, and of which they cannot be deprived, except under the exercise of the rights of eminent domain. Among those rights are the rights of access to the navigable river or sea from the front of his lot; the right to make a landing, wharf, or pier for his own use, or the use of the public, subject to the supervision of the state to see that it does not interfere with navigation; the rights of fishery, of ferry, of towing on the banks, of landing, lading, and unlading; the right of accretion," etc. Report of Hon. Daniel Pratt, attorney general, to the senate, January 28, 1875. This quotation is not made because it has the force of authority, but because it expresses in terse language the doctrine which prevails in this state upon that subject. The same doctrine is laid down by Angell, in his learned work on Tide Waters, in these words:

"Although the king is regarded as the legitimate proprietor, yet his character in this respect is fictitious, inasmuch as he cannot exercise his ownership to the exclusion, inconvenience, or injury of his subjects. He can therefore be considered only as guardian and trustee for the benefit of his subjects." Ang. Tide Waters, 135.

The same doctrine was laid down by the supreme court of the United States, in the Chicago Lake-Front Case, in the following language:

"That the state holds the title to the lands under the navigable waters of Lake Michigan, within its limits, in the same manner that the state holds title to soils under the tide water, at common law, we have already shown. But it is a title different in character from that which the state holds in lands intended for sale. It is different from the title which the United States holds in the public lands which are open to pre-emption and sale. It is a title held in trust for the people of the state, that they may enjoy the navigation of the waters, carry on commerce over them, have liberty of fishing therein, freed from the obstruction or interference of private parties." Illinois Cent. R. Co. v. State of Illinois, 13 Sup. Ct. Rep. 110.

A line of decisions which commenced with the celebrated Story Case, 90 N. Y. 122, holds that an owner of land abutting upon a public street has a property right therein for access, light, and air, and that the state has no power to grant a railroad the right to occupy the street, when such occupation affects injuriously the enjoyment of such rights, without compensation. In the opinion of the court of appeals in the Rumsey Case, 133 N. Y. 79, 30 N. E. Rep. 654, where the Gould Case was overruled, it was said:

"Unless there is some distinction to be made between the rights which pertain to an owner of land upon a public river, and one upon a public street, which is not perceived, then the principles sanctioned by this court in these cases virtually overrule the Gould Case, as they are apparently irreconcilable."

So far as those cases relate to the right of access, they are applicable to this case.

We have already seen that upon the declaration of independence, in 1776, the people of each state became sovereign, and in that character became invested with the absolute right to all navigable waters, and the soil upon which they rested, for their own common use; and such title was held by the state, in its sovereign capacity, in trust for the public, and continued to be so held and owned, in such trust capacity, until 1788, when it surrendered the right to control the waters for purposes of commerce and navigation. But it surrendered nothing more. It still remains the owner of the soil, and can make grants of the same, within the restrictions of the statute, but the extent of the grant in question is almost sufficient, of itself, to prove that its execution was in contravention of the trust under which the property is held. The trust is governmental, and the property cannot be alienated except in the execution of the trust in the interest of the beneficiaries. It cannot with any propriety be claimed that the surrender of a strip of land containing thousands of acres, from New York to Albany, to a trading corporation, is in the interests of the public. The size of a similar grant did not escape the attention of the supreme court of the United States in the case of Illinois Cent. R. Co. v. State of Illinois, supra, and in relation thereof it was said in the opinion:

"We hold, therefore, that any attempted cession of the ownership and control of the state in and over the submerged lands in Lake Michigan by the act

of April 16, 1869, was inoperative to affect, modify, or in any respect control, the sovereignty and dominion of the state over the land, or its ownership thereof."

It is not necessary for me to hold this grant void, except so far as it contravenes the rights of these plaintiffs, and my conclusion is that their rights remain unimpaired. It must be borne in mind that the right of access is an exclusive right of the riparian proprietor, and the grant in question assumes to convey a strip of land in front of the east shore of the Hudson river, without any reservation in favor of shore owners, and thus deprive them of their exclusive rights of access to the water. My conclusion, therefore, is that the grant in question is unavailing against these plaintiffs, and their exclusive right of access to the water; and the obstruction of which they complain must be removed, and they must have judgment therefor.