(*Circuit Court of Cook County. In Chancery.*)

## The South Shore Transportation Co., et al.

### vs.

## The World's Columbian Exposition, the World's Fair Steamship Co., et al.

### (1893.)

1. PUBLIC PARKS—OPEN ON SUNDAY WHERE USED AS EXPOSITION— RIGHT OF TAXPAYER. Where a public park is used as an exposition by authority of the legislature a taxpayer is not entitled to have the exposition remain open on Sunday for the reason that it is located in a public park. The remedy of such taxpayer is to challenge the power of the legislature to surrender the use of a public park for exposition purposes.

2. TAXPAYER—RIGHT TO PREVENT BY INJUNCTION MISAPPROPRIATION OR DIVERSION OF PUBLIC PROPERTY IN ABSENCE OF SPECIAL DAMAGE. A citizen or taxpayer who suffers no special damage or injury different from the public at large by reason of the misappropriation or diversion of public property cannot maintain a bill in his own name for an injunction to prevent the same. Such a bill must be brought by the attorney general.

3. SAME—RIGHT TO PREVENT DIVERSION OR MISAPPROPRIATION OF PUBLIC PROPERTY BY INJUNCTION—LACHES. Where a public park is appropriated by the legislature for the purposes of an exposition a taxpayer cannot question the right of the legislature so to do where action is not taken until a large sum of money has been expended on such exposition. The complainant is barred by *laches*.

4. PUBLIC PROPERTY—CESSION TO UNITED STATES. Where public park property is ceded by the state to a commission appointed by the United States for the purpose of an exposition it is doubtful whether the courts of the state have power to interfere with such property.

5. UNITED STATES—OFFICERS OF—POWER OF STATE OVER. A state court has no power to interfere with officers of the United

States in the discharge of duties imposed upon them by act of congress.

6. EQUITY—RELIEF IN—COMPLAINANT MUST DO EQUITY. Where the United States donates a sum of money to an exposition on the condition that such exposition remain closed on Sunday, a taxpayer cannot compel the keeping open of such exposition on Sunday without offering to return the amount of the donation. A court of conscience should also be a court of honor.

7. RIPARIAN RIGHTS—BUILDING PIERS AND WHARVES. The right to build wharves and piers in navigable waters as appurtenant or incident to the ownership of the adjoining land, is a riparian right.

8. SAME—DEPENDENT UPON TITLE TO BANK. Riparian rights are dependent upon the title to the bank and not upon the title to the bed of the lake or stream in front of the bank.

9. SAME—WHERE THERE IS EBB AND FLOW OF TIDE. There is no difference between the rights of a riparian proprietor's bordering a navigable stream whether the waters be inland rivers or have the ebb and flow of the tide.

10. LAKE MICHIGAN—RIPARIAN RIGHTS IN. Riparian proprietors on Lake Michigan have the right to build piers, wharves and landings for their own exclusive use and enjoyment.[1]

11. WHARVES—WHETHER PUBLIC WHEN BUILT IN CONNECTION WITH PUBLIC PROPERTY. Where wharves are built by the public authorities in connection with public property or as an extension of a public street, they do not thus become public wharves open to indiscriminate use.

12. WATERS—WHETHER RIPARIAN OWNER CAN EXTEND HIS STRUCTURE BEYOND THE POINT OF NAVIGATION. A riparian or littoral owner must not extend his pier or wharf beyond the line of navigability. He is not required, however, to stop at the exact point where navigation begins, but as such structures are permissible only in aid of navigation they may extend as far as necessary for the purposes intended.[1]

13. PUBLIC NUISANCE—RIGHT OF INDIVIDUALS TO REDRESS. Individuals who sustain no private injury are not entitled to redress against a public nuisance. Only the attorney general can take action.

14. MONOPOLIES—WHAT CONSTITUTES. It does not constitute a monopoly for an owner of a private wharf to give an individual an exclusive right to run a line of steamers from or to such wharf.

15. WHARVES—WHETHER PUBLIC OR PRIVATE. Wharves, docks or landing places may be private or public, depending upon the purpose for which the same are built, the uses to which applied,

[1] But see 202 Ill. 427, 177 Ill. 468.—Ed.

the place where located and the nature and character of the structure.

16. SAME—WHETHER AFFECTED WITH PUBLIC USE. When a private wharf is thrown open to the use of the public it becomes affected with a public use and must be open to all upon the same terms and conditions.

17. SAME—DISCRIMINATION AGAINST PARTICULAR PORTS AND VESSELS IN USE OF. Where the owner of a wharf permits its use to one steamship line generally but denies the use of such wharf to vessels from particular ports, such discrimination is illegal and tends to obstruct commerce. There can be no discrimination between different members of the public or between vessels from different ports.

18. PUBLIC USE—RIGHT TO ABANDON. Where a pier has for a long time been used as a public landing place the owner of the pier has a right to discontinue its use for that purpose. It does not follow that because the public was permitted to use it that the public has the right to use it forever.

Bill for injunction. Heard before Judge Murray F. Tuley. The facts are stated in the opinion.

TULEY, J.:—

The main complainant in this case is an Illinois corporation, owning a number of vessels engaged in carrying passengers from the city to the different public parks and other points of interest. There are three citizens owning vessels joined with the corporation as complainants. Some of the complainants are alleged to be taxpayers in South Chicago.

In 1869, under legislative act, Jackson Park was established as a public park, was paid for and is still maintained by taxation of the towns of South Chicago, Hyde Park and Lake, now a part of the city of Chicago. The park was established as a public park for the recreation, etc., of the public, and declared to be "free to all *persons forever.*"

A part of section 15, town 39 north, range 14, extending along the lake shore in the heart of the city was dedicated by the commissioners of the Illinois & Michigan Canal, originally as "Michigan Avenue," a street of irregular width, having for about a half a mile frontage on the shore of Lake Michigan as its eastern boundary. This part of Michigan avenue

next to the lake shore and next to the Illinois Central Railroad right of way, became known and was recognized by the state legislature as "Lake Park."

Subsequently, in 1850, the Illinois Central Railroad was granted by the state a right of way 200 feet in width and Chicago was made one of its terminals. The railroad had the right to lay its tracks within the city upon such terms as it might agree upon with the city council. An ordinance was passed by which the city consented to the railroad laying and locating its right of way along the lake shore in front of section 15, at a distance of 400 feet east of the west line of Michigan avenue. Among other terms and conditions of the ordinance was a provision that the railroad should build and maintain a stone pier work at a distance of 300 feet east of and parallel with said 400 foot line. The ordinance was accepted and the pier built. In the course of a few years the space between Michigan avenue (which had been narrowed to 100 feet) and the right of way of the railroad became filled with debris from the city, and became a common or park of about 22 acres known as Lake Park. Afterwards, and in 1869, the state legislature attempted to grant the railroad all the submerged lands in front of Lake Park which it is alleged by the recent decision of the United States supreme court,[1] only amounted to a license to improve the harbor of the city, which license has been subsequently revoked by the state; that the United States several years ago constructed a harbor of refuge for vessels in front of said Lake Park, and it is alleged that the shores, wharves and landings at said Lake Park have been since used for interstate and foreign commerce; and that among the vessels so using the same were those of the complainants; that the waters in front of Jackson Park are navigable waters and that the park commissioners some years ago erected landing places which were used by complainants' vessels and others to land passengers visiting said Jackson Park.

In 1890 the congress of the United States passed an act to

---

[1] *Illinois Central R. R. Co. v. Illinois*, 146 U. S. 387.—Ed.

provide for celebrating the 400th anniversary of the discovery of America by Columbus by holding an international exhibition of art, industries, etc., at Chicago; that the act of Congress provided for the appointment of United States commissioners, to be known as the "World's Columbian Commission," with power to determine the plan and scope of the exposition, award premiums, etc., and to accept, in its discretion, such sites and plans, etc., for buildings (to be erected by and at the expense of) as might be tendered by the "Worlds' Columbian Exposition Co." a corporation organized under the laws of Illinois; and that the plans for and. the rules and regulations of the Illinois corporation for entrance fees, or otherwise affecting the rights, etc., of exhibitors or of the public, should be subject to such modifications as the United States commission should impose.

The World's Columbian Exposition Co. was organized for the purpose of promoting and carrying on the World's Fair or Exposition, and in 1890 the Illinois legislature passed an act [1] granting "to the authorities having the charge and management of said World's Columbian Exposition" "the use and occupation of all lands or right therein of the state of Illinois, whether submerged or otherwise, within the present limits of the city of Chicago or adjacent thereto, which may be designated and selected by said authorities as the site or sites for the holding of said World's Columbian Exposition," and the use and enjoyment, with the consent of the city, of any public or park grounds, and rights appurtenant thereto, the title or control of which was in the city, with "authority to improve the same * * * in such manner as to said authorities" should seem necessary or expedient, and in case any public park should be selected for a site or sites, for such exposition, authority was granted to its park commissioners to allow the use of the same for the purposes of the exposition, on such terms and conditions as might be agreed upon between the park commissioners and said authorities; that the Exposition Co. tendered to the U. S. Columbian Commission,

[1] Sess. Laws of Ill. 1890, pp. 5, 6.—Ed.

Jackson Park and Lake Park as sites for the exposition and the same were accepted; that in September, 1890, the city council, by ordinance, did grant to the Exposition Co. authority to take possession of and control and exercise all the jurisdiction the city possessed over Lake Park and its appurtenances, to be used exclusively for the purposes of the exposition or fair, which ordinance was to be accepted in 30 days or to be null and void. The ordinance was not formally accepted, but was acted upon as if accepted; that the commissioners of South Park and the directors of the Exposition Co. had agreed upon terms for the use of said Jackson Park for the purposes of the exposition.

It is alleged that in June, 1892, the directors of the Exposition Co. made a concession or contract with Stone and others, who acted for and who were given power to assign the same to a corporation known as the World's Fair Steamship Company, whereby the Steamship Company was given the exclusive right and privilege to transport passengers by water to and from the World's Fair or Exposition grounds, and to and from all points between the city of Kenosha,—50 miles from Chicago,—on the north and East Chicago Harbor on the south, and to make the privilege more valuable, agreed that the Exposition Co. would not allow vessels, or passengers from the same, from said points and points between, and the Exposition grounds to land at any pier or piers at the Fair grounds, saving only the boats (and passengers thereon) of said Steamship Co. and that no gate or entrance should be established on the north side of said grounds, if any pier or landing place should be established or built within 3,000 feet of the north line of the fair grounds at Jackson Park, nor any gate on the south side of said fair grounds; that by said contract the Exposition Co. agreed to build at Jackson Park and at Lake Park piers with not less than 2,000 feet frontage and to cause to be constructed over the Illinois Central Railroad tracks a viaduct to the pier at Lake Park; that the pier at Lake Park should not be used for any other purpose than the business of the Steamship Co., but the Exposition Co. re-

served the right for the landing and embarkation of passengers at Jackson Park from vessels coming from points outside of said limits, Kenosha on the north and East Chicago Harbor on the south, but such use should not interfere with the Steamship Co.'s business or use of such pier; the Steamship Co. agreeing to put into service vessels with capacity to carry 15,000 passengers an hour, not to charge more than 25 cents for the round or 15 cents for a single trip, between Lake Park and Jackson Park; to police the piers, etc., and to pay the Exposition Co. 20 per cent. of the gross receipts; that piers extending into the lake a distance of 1,000 feet have been built at Lake Park and at Jackson Park; that the directors of the Exposition Co. threaten to make such rules and regulations as may be necessary to carry out said agreement and to prevent complainants from landing at, or receiving and discharging passengers at said wharves or piers or at the landings at Jackson Park constructed by said park commissioners, although complainants are willing to pay such tolls or fees as may be charged to other vessels.

An amendment to the bill sets out the passage of an act of congress in 1892 appropriating two and one-half millions of dollars for the World's Fair on condition that the fair, should be closed upon Sundays, and making it the duty of the United States Commission to see that the proper rules and regulations are made for that purpose.

The relief prayed is for an injunction restraining the directors of the Exposition Co. from closing the gates of the fair on Sunday; also to enjoin the Exposition from discriminating against complainants as to landing at and receiving passengers to and off said piers or wharves from complainants' vessel; also from refusing to permit such passengers to land on said piers and enter said Jackson Park on the same terms as the vessels and passengers from other boats are permitted so to do; and from carrying out said contract with the Steamship Co. or according to said Company or its vessels any rights or privileges not accorded to complainants and their vessels.

The only defendants served with process are the Exposition Co. and the Steamship Co.  The former has demurred to the bill, and the latter has filed an answer.  A number of affidavits in support of the answer and of the bill have been read. The averments of the bill as to the laws and ordinances set out are admitted, as is also the contract with the Steamship Co., which is defended upon the ground that it is lawful and for the best interest of the fair and of the public.

It appears from the affidavits that heretofore there has been no wharf or dock at Lake Park, but that the complainants and others have used the pier of the Illinois Central Railroad as such and have carried passengers therefrom to a small pier built by the Park Commissioners at Jackson Park, and to other places.

## THE SUNDAY QUESTION.

The complainants insist they have the right to an injunction against closing the exposition upon Sundays because Jackson Park was created and dedicated by the general assembly of Illinois and paid for by the taxation of property in South Chicago, Hyde Park and Lake, as ''a public park for the recreation, etc., of the public and free to all persons forever;'' that it was beyond the power of the state legislature or the park commissioners to pass any act or ordinance closing the park on Sunday, or any other day.

If a bill had been filed in apt time by a complainant having the right to challenge the power of the state legislature to surrender this public park to the World's Exposition purposes, it would have presented a very serious constitutional questions.  The complainants cannot now raise it for the following reasons:

1st. That the law is well settled that a citizen or taxpayer who suffers no peculiar damage or injury different from that of the public at large, by reason of the misappropriation or diversion of public property, such as a street or commons, can not maintain a bill in his own name for an injunction to prevent the same, but such a bill must be brought by the

attorney general as representing the public at large. The case of *City of Chicago v. The Union Building Association*, 102 Ill. 379, is directly in point. There a property owner on La Salle street filed a bill to restrain the closing up of La Salle street, where the present board of trade stands, alleging that his property had been largely assessed for, and had paid for opening La Salle street at the point where the city council proposed to vacate and close it, but the supreme court held that such a bill could not be brought except by the attorney general. In this case these complainants suffer no other or different injury than other citizens or tax payers suffer, the injury being common to all alike, and the attorney general only can represent the public.

2nd. Even if the bill would lie by these complainants, it is not brought in apt time so far as this question is concerned, as they would not be allowed to lie still until twenty million dollars have been expended, and then question the right to appropriate the park to the purposes of the fair. The state having authorized the "authorities having in charge the World's Columbian Exposition" to take possession of Jackson Park and use it for the World's Fair, it is certainly a debatable question whether or not the jurisdiction over the park has not been ceded to the United States for the World's Fair purposes. The cession is to the authorities having in charge "the World's Exposition." The United' States, by its "World's Columbian Commission" accepted the sites. The "Commission" by the act of congress is given large independent powers and a supervising power over the acts of the Illinois corporation. The act of congress created the fair and made it an "international exposition" and located it on sites determined by its own "Commission."

It is true that the United States graciously permitted the Illinois corporation to raise the money and pay all the expenses, but that does not make it any the less an "International Exposition" under the control of the United States government. The United States did make a donation of two and one half millions of dollars (it seems like sarcasm to call

it a donation) on condition that the fair be closed upon Sundays. It, by the same act, directed its "Commission" to see that the requirement as to closing the fair upon Sunday was complied with.

It is also a serious question as to whether the state courts have any jurisdiction or power to interfere with the acts of this "Commission." The "Commission" is a United States agency and its officers may be said to be—as to the fair—*pro hac vice* officers of the United States. It is a general rule that a state court has no power to interfere with the United States officers in the discharge of duties imposed upon them by an act of congress.

The bill is deficient in another respect in that it asks the court to enjoin the closing of the fair upon Sundays without requiring the return to the United States treasury of the two and one-half million dollars donation. This would not be honest. A court of conscience should be also a court of honor.

The proper parties, neither complainants nor defendants, are before this court so as to enable it to pass upon the right to close the fair upon Sundays.

### As to the Piers and Wharves.

Admitting that in the act referred to, the legislature, by the words "the authorities having in charge" the World's Fair intended to make the grant to the corporation "The World's Columbian Exposition," then that corporation has become vested with the use and occupation and with all the right, title and interest of the state, and of the city of Chicago, in Lake Park, its appurtenances and the submerged land in front of the Park, with "the right and authority to improve the same for the purpose of the World's Exposition in such manner * * * as should seem necessary or expedient."

By the same act and the ordinance of the South Park Commissioners the Exposition Co. became vested with all the power, for World's Fair purposes, over Jackson Park that the commissioners could confer. But the parks being upon

the banks of Lake Michigan, the Exposition Co. became vested, temporarily, with all the rights of a riparian proprietor.

. The right to build out piers or wharves into public or navigable waters as appurtenant or incident to the ownership of the adjoining land is a riparian right. This riparian right is dependent upon the title to the bank and not upon the title to the bed of the lake, in front of the bank. *Dutton v. Strong*, 1 Black, 23; *Railroad v. Schurmeir*, 7 Wall. 272; *Yates v. Milwaukee*, 10 Wall. 497; *Ensminger v. People*, 47 Ill. 384; *City v. Lafflin*, 49 Ill. 172; Gould, Law of Waters, sec. 148, and cases cited.

If I understand the senior counsel for complainant, he contends that there can be no private piers or wharves upon Lake Michigan or upon navigable waters where there is an ebb and flow of the tide, whatever right there may be to build such upon navigable rivers and interior small lakes. The case in 7 Wallace, 272, *ante,* decides that there is no difference between the rights of a riparian proprietor's bordering navigable waters in this country, whether the waters be inland rivers or have the ebb and flow of the tide. Nor is it true that there can be no private piers or wharves upon navigable waters where there is an ebb and flow of the tide. The right is a common law right as incident to the ownership of the bank. *Lyon v. Fishmonger's Company,* L. R. 1 App. Cas. (1876) 662.

In *Dutton v. Strong, ante,* the question arose as to the right to build out into Lake Michigan a private wharf and the court held that "undoubtedly, a riparian proprietor may construct a pier, wharf or landing place for his own exclusive use and enjoyment," and "may have the right to exclude all other persons from its use."

It is contended that these wharves being built in front of public parks, they became a part of the public parks and must be, as those are, common to everybody; that the wharves are mere extensions of the public grounds. This precise question arose in a Detroit case. The city of Detroit having

authority by its charter to build public wharves and lease the same, built one at the end of a street and leased it to a private party. It was contended, as here, that the wharf was merely an extension of the public ground or street and was therefore open to the use of the public. The court held: (Syllabus.)

"The wharves in the city of Detroit, whether terminating highways or not, are not highways, but are private property, and where they are owned by the city, may be leased like other corporate property to private lessees. The title is proprietary, and not a public easement."

That the term "public wharf" did not mean that it was dedicated to public use like a highway, and meant only that it belonged to the city, "and that such wharves are not open to indiscriminate use." *Horn v. People,* 26 Mich. 221. See, also, *Backus v. Detroit,* 49 Mich. 110; *Scott v. Lyng,* 59 Mich. 43.

These cases hold that a municipal corporation may exercise the same rights as to streets terminating at the water's edge to build wharves and piers out to navigable waters, that an individual riparian proprietor has to build in front of his own land and that such wharves are not necessarily public wharves. The reasoning of those cases commend them to my judgment and induce me to follow them as good law.

Independent of the right of the Exposition Co. as riparian owner (for the time of the fair) to build such wharves, there is another ground upon which the Exposition Co.'s right to build such wharves and to enter into the contract for the putting on and running a line of steamers from Lake Park wharf to the Jackson Park wharf, can be sustained. It has not only the right to improve the submerged land as it should deem necessary or expedient, but it has the right to do any and every thing that may be necessary to promote the interests of and make the World's Fair a success.

It appears that both Lake Park and Jackson Park—distant from each other about eight miles—have been selected as sites for the World's Fair. Upon Lake Park is the Art Exposition and the remainder of the fair is at Jackson Park.

The Exposition Co., under the broad powers given it, if it
deemed it necessary for the public interest and the success of
the fair, could build these piers or wharves and itself or by
its agents could put on a line of steamers and boats to trans-
port passengers between the fair grounds at Lake Park and
the fair grounds at Jackson Park. The doing so would be
no more an interference with complainant's rights to navigate
the lake and carry passengers to and from the parks, than it
would be an interference with the Illinois Central Railroad's
right to carry visitors to and from the fair if the exposition
having a right of way should build a railroad of its own be-
tween the two parks.

It is contended by complainants that the piers or wharves
in question, being one thousand feet in length, extend be-
yond the point of navigability and so far as they extend be-
yond such point, become common property, open to the use of
all vessels and persons.

The general rule undoubtedly is that a riparian or littoral
owner must not extend his pier or wharf beyond the line of
navigability. By this it is not meant that he must stop at
the exact point where navigation begins, but as such struc-
tures are permissible only in aid of navigation, they may ex-
tend as far as necessary for the purposes intended. "To
reach navigable water," says Chief Justice Ryan, "neces-
sarily implies reaching it with effect" and necessarily implies
"some intrusion into navigable water and the peril of ob-
structing naviga.ion." If such structures extend too far and
obstruct navigation, they become a common or public nuis-
ance, but the rule is that individuals are not entitled to re-
dress against a public nuisance. By the building or too great
extension of these piers there is no injury peculiar to com-
plainants and different from that suffered by the public at
large. Unless he sustains a private injury, he cannot main-
tain an action to remove the public nuisance, nor abate the
same, nor can he appropriate such structure or materials com-
posing the same to his own use. Gould, Law of Waters, sec.
128 and cases cited. I am not prepared to say that the

wharves in question, considering the purpose for which they are built, extend beyond a point necessary and justifiable. It is sufficient, however, to say that only the state, by its attorney general, can raise that question.

### AS TO MONOPOLY AND DISCRIMINATION.

The building of the wharves and the running of a line of steamers between them, carrying passengers, no more constitutes a monopoly than would it be a monopoly for an individual to run a line of steamships between his private wharf in the Chicago river and his private wharf in Buffalo or other point; nor can it be said to be any discrimination between vessels or persons so long as no other vessels than those of the Steamship Co. use the wharves in question.

### PUBLIC WHARVES.

The same authority, *Dutton v. Strong, ante,* lays down the correct rule, that "piers or landing places, and even wharves, may be private, or they may be in their nature public, although the property may be in an individual owner;  *  *  * whether they are the one or the other may depend  *  *  * upon the purpose for which they were built, the uses to which they have been applied, the place where located, and the nature and character of the structure." See: *State v. Jersey City,* 25 N. J. L. 525; *The Wharf Case,* 3 Bland, 361; *Swords v. Edgar,* 59 N. Y. 28; Gould, The Law of Waters, sec. 119.

Does the contract in question limit the use of the wharves to the Steamship Co. so as to make them private wharves? When a wharf belonging to an individual or a private wharf is thrown open to the use of the public, it becomes affected with a public interest and must be open to all upon the same terms and conditions. De Portibus Maris, 1 Harg. Law Tracts, 78; *The Wharf Case,* 3 Bland, 361; *Munn v. Illinois,* 94 U. S. 113, 151.

There can be no discrimination between different members of the public or between vessels from different ports.

The Columbian Exposition Co. built these wharves and has the control of them. In the contract with the Steamship Co. it reserved the right for the landing and embarkation of passengers at the pier at Jackson Park from and to boats coming from. and returning to points outside of the points specifically named which are, Kenosha upon the north and East Chicago Harbor on the south. This in effect is to declare that complainants and others running boats from points between Kenosha and East Chicago to Jackson Park or the pier, shall not use the pier, but that all boats from those points and all places outside of those two points, without regard to the ports from which they come or the ownership thereof, may use this pier at Jackson Park.

The people owning vessels between those two ports are as much a part of the public and are entitled to as many privileges as to the use of the pier as those from and outside of the two points mentioned. It is an illegal discrimination between ports and vessels and tends to obstruct commerce.

I am of opinion that the contract referred to is a legal one, made in the interests of the public, and is to the great advantage of the public as to the transportation between the two parks and parts of the fair, but that the reservation above specified, if acted upon, will entitle the complainants and others to the same rights and privileges at least as may be accorded to boats coming from points outside of Kenosha on the north and East Chicago Harbor upon the south.

The complainants are entitled to an injunction restraining the defendants, the Columbian Exposition Co. and the Steamship Co. from preventing the complainants from landing their vessels and embarking and disembarking passengers and freight at the Jackson Park pier upon the same terms and conditions that it may permit other vessels from Kenosha on the north and East Chicago Harbor on the south, and points beyond those ports, to land at, and embark and disembark passengers from said Jackson Park pier.

As to the small pier heretofore used to land and disembark

passengers at Jackson Park, it was within the power of the park commissioners to discontinue its use as a landing place and is clearly within the power of the Exposition to do so. It does not follow because the public was permitted to use it that the public has the right to use it forever.

As the Illinois Central Railroad and the city of Chicago, defendants herein, have not been served with process, no rulings now made will be taken to affect their respective rights and interests.