### DUTTON ET AL. *vs.* STRONG ET AL.

1. Riparian proprietors have a right to erect bridge piers and landing places on the shores of navigable rivers, lakes, bays, and arms of the sea, if they conform to the regulations of the State and do not obstruct the paramount right of navigation.

2. The right to make such erections terminates at the point of navigability.

3. Where they are confined to the shore, and no positive law or regulation is violated by their construction, he who alleges them to be a nuisance or an obstruction to navigation must prove it—for the presumption is the other way.

4. Piers or landing places may be either public or private, and the question whether they belong to one or the other class depends upon the purpose for which they were built, the uses to which they have been applied, the place where located, and the character of the structure.

5. A riparian proprietor may construct a pier for his own exclusive use and benefit; and where he has reserved it to himself and never held it out as intended for the use of others, no implication arises, if a party without leave moors his vessel to such a pier, that he has done so with the owner's consent.

6. Where a vessel is thus wrongfully attached to a private pier without the consent of its owner, the peril of the vessel, no matter how great, imposes no obligation upon such owner to allow her to remain, and hazard his own property to save that of a trespasser.

THIS case came before the Supreme Court upon a writ of error to the District Court of the United States for the district

of Wisconsin. It was, in its origin, an action of trespass on the case brought by H. Norton Strong and William H. Goodnow against Achas P. Dutton and Cyrus Hines.

In 1855, Messrs. Dutton and Hines, the plaintiffs in error, owned a pier situated at Racine, upon Lake Michigan, and extending into the lake, which served the purposes both of a landing place for freight and for its stowage. This pier was private property, and although its owners, who were forwarding merchants, sometimes moored vessels, which came there upon their own business, to its timbers, it does not appear that they ever suffered anybody else to do so, or that any other person claimed the right. On the sixth of May, 1855, the ship Homer Ramsdell, owned by the defendants in error, Messrs. Strong and Goodnow, was driven by stress of weather to the neighborhood of this pier, and the captain, fearful of going ashore, made his vessel fast to it. The violence of the gale increased the pull on the hawser, by which the ship was moored, to such a degree that the piles began to give way under the strain, whereupon one of the owners of the pier warned the master to cut loose, or they would themselves set him adrift. The master did not heed this warning, and the defendants, after waiting to see if he meant to obey it, cut the hawser. The vessel, as soon as set loose, was driven upon another pier, and to prevent her utter destruction was scuttled and sunk.

The court below was requested by the defendants in error to instruct the jury that if the evidence satisfied them that it was material for the preservation of the pier to cut the vessel loose from it, the person in charge of the pier had a right to do so, as against all rights of property in the vessel, after reasonable notice given and request made and refused for the vessel to leave. This instruction the court refused to give, and charged the jury, that the pier was run out into the lake for the accommodation of commerce, and was used as private property in public business; that the vessel was liable for such damage as she was doing the pier, and that the owners of the pier were not justifiable or excusable in cutting the vessel loose, if it was material for the safety or protection of the pier. To this portion of the court's charge, and to its refusal to grant two other

prayers of the defendant, not necessary to be noticed here, because not considered in this court, the defendants excepted. The verdict of the jury and the judgment of the District Court were in favor of the plaintiffs; whereupon the defendants took this writ of error.

*Mr. Doolittle*, of Wisconsin, for plaintiffs in error, argued that the court below erred in affirming the proposition that the owners of a private pier had no right to cut away a vessel which was fastened to it without their consent, and contended that the acts of the plaintiffs in error, being justified by law, did not subject them to any damages in an action like this.

*Mr. Hibbard*, of Wisconsin, for defendants in error. After the vessel had been moored to the pier under the circumstances, the plaintiff in error had no right to cast her off. The pier was an unauthorized nuisance in the lake. The commercial and legal character of the Western lakes is so fixed that those waters must be considered, commercially and legally, seas. *Ordinance* 1787, (1 Stat. at L. 52, N.;) *Fitzhugh* vs. *Genesee Chief*, (12 How., 443;) *Moore* vs. *The Am. Trans. Co.*, (24 How., 1.)

The evidence was sufficient to permit the jury to find, as a matter of fact, that the pier was a nuisance. (3 Kent's Com., 427;) *Lord Hale*, (De Portibus Maris, Harg. Ed., 85;) *Lord Hale*, (De Jure Maris, Harg. Ed., 8, 9;) *Rex* vs. *Lord Grosvenor*, (2 Starkie, 511;) *Blundell* vs. *Cutterall*, (5 Barn. & Ald., 268, 7 Eng. C. L., 88, 108;) *Rex* vs. *Ward*, (4 Adol. & El., 384, 31 E. C. L., 92;) *Reg.* vs. *Randall*, (1 Car. & Marsh., 496, 41 E. C. L., 272;) *Simpson* vs. *Scales*, (2 Bos. & Pul., 496;) *The Mayor, &c.*, vs. *Brooke*, (7 Adol. & E., 339, 53 E. C. L., 339;) *Hart* vs. *The Mayor of Albany*, (9 Wend., 571;) *The People* vs. *Platt*, (17 John., 195, 209;) *The United States* vs. *The New Bedford Bridge Co.*, (1 Wood & Minot, 401, 411;) *Rex* vs. *Caldwell*, (1 Dallas, 150;) *Martin* vs. *Waddell's Lessee*, (16 Peters, 367, 421.)

This must be especially so when there is no proof that the plaintiff in error owned the soil along the shore. The pre-

sumption, besides, is, that he has no right thus to occupy, but is a mere wrong-doer.

Of course, (irrespective of the right of any one to abate a nuisance,) it cannot be claimed that the plaintiffs in error had any right in the nuisance which would permit him to cast off the vessel, thus exposing it to peril, under any circumstances. Most certainly not when the vessel was forced there by stress of weather, as the jury had a right to find she was. *The Schooner Mary*, (1 Gallison, 206;) *Peisch* vs. *Ware*, (4 Cranch, 347;) *The Frances and Eliza*, (8 Wheat., 398;) *The Gertrude*, (3 Story, 68.)

The plaintiff in error, by building his pier in the lake, invited, and, at least impliedly, licensed vessels, in pursuit of their business, to approach and moor to the pier. *Balt.* vs. *Stennett*, (8 T. R., 606;) *Bradslee* vs. *French*, (7 Conn. 125;) *Heaney* vs. *Heeney*, (2 Denio, 625.) This license, of necessity, included the right to use the dock according to the exigencies of the case. Necessarily, therefore, when those exigencies required that the vessel should hold to the pier after once mooring there, the plaintiffs in error had no right to revoke the license, and cast off the vessel, thus causing her injury.

Mr. Justice CLIFFORD.* This case comes before the court upon a writ of error to the District Court of the United States for the district of Wisconsin. It was an action of trespass upon the case, and was instituted in the court below, on the seventh day of July, 1856, by the present defendants. They were the owners of a certain vessel called the Homer Ramsdell, and the plaintiffs in error, who were the defendants in the original suit, were the owners and occupants of a certain bridge pier, situated at Racine, in the State of Michigan, southerly of the harbor at that place. Like other similar erections, it was connected with the land at the mar-

---

* The reader of these Reports will understand that an opinion delivered by one judge is *the opinion of the court* in that case; and it is the opinion of the *whole* court, unless a dissent be reported.

gin of the lake, and extended into the water, so that ves
sels could approach it for the purpose of taking in freight,
serving both as a wharf to the navigable water of the lake,
and as a place of deposit for merchandise designed for trans-
portation by water.   As stated in the bill of exceptions, the
defendants were forwarding merchants, and the case shows
that they had used the bridge pier for the purpose of mooring
vessels coming there in the course of their business; but it
does not appear that it had ever been used for that purpose by
any other persons.  Another bridge pier, situated south of
the one owned by the defendants, had been constructed, and
was occupied by other parties, and was used for the same pur-
pose by its owners as that of the defendants.   According to
the transcript, the declaration contained four counts, but they
were all founded upon the same transaction.   Three of the
counts were substantially the same, and alleged, in effect, that
the plaintiffs were the owners of the vessel; that, while she
was lawfully employed in navigating the waters of Lake Michi-
gan, she had, by stress of weather and the perils of navigation,
been driven alongside of a certain dock and common mooring
place at Racine, commonly called a bridge pier, to which she
was then and there moored and fastened by cables and lines,
and that the defendants, on the seventh day of May, 1855,
wrongfully cut and severed the moorings by which the vessel
was fastened, and cast her loose from the pier; and that, in
consequence thereof, she was driven, by the force of the wind
and waves, against a certain other dock and pier there situate,
and on to the shore of the lake, by reason whereof she was
greatly damaged, and so injured that she sunk in the lake.

Unlike the first three counts, the fourth alleged that the
defendants, at the same time and place, did, wrongfully and
unlawfully, erect, and cause to be erected, a certain permanent
bridge or structure on the navigable waters of Lake Michigan,
whereby the vessel of the plaintiffs was wholly unable to
make the harbor at Racine, or to put out into the lake, as she
otherwise might and would have done; and, in consequence
of the obstruction, was, by the wind and waves, driven on the
shore, and against a certain dock, and greatly damaged, as

alleged in the other counts of the declaration. To the whole declaration, as more fully set forth in the transcript, the defendants pleaded that they were not guilty, and on that issue the parties went to trial. None of the evidence given by the defendants is reported in the bill of exceptions; but it appears, from that introduced by the plaintiffs, that the schooner was bound from Chicago, in the State of Illinois, to Racine, in the State of Wisconsin, and that she was sailing in ballast. Assuming the testimony of the master to be correct, she left Chicago on the sixth day of May, 1855, and arrived off the harbor of Racine between twelve and one o'clock at night in perfect safety. When she was about one-fourth of a mile from the harbor, the wind suddenly changed from south to north-northeast, and blew hard. Those in charge of the vessel state that they could see but one light at the time; and, supposing it to be the light on the northern pier in the harbor to which they were bound, they headed the vessel for that light. Contrary, however, to what they supposed, there was no light on either of the harbor piers, and, in point of fact, it was a light on the bridge pier of the defendants. Heading for that light, the vessel, as she advanced, was approaching the shore, and she soon passed between the two bridge piers, already described as situated southerly of the harbor. When they got close to the light they discovered the mistake; but, instead of changing the course of the vessel, they took in sail and let go the anchor, to prevent her from going on to the beach. Whether these precautions were the best that could have been adopted, or not, they had the effect to check the speed of the vessel, and, as she ceased to make headway, she sagged over against the southern bridge pier without receiving any injury. Their next step was to get out lines on to the bridge pier of the defendants, in order to work the vessel away from the southern pier, and prevent her from pounding. Finding that the lines were insufficient, they got out the large hawser and two other lines, and finally, with the aid of six additional men, and after getting out another hawser belonging to the vessel, and purchasing a new one for the purpose, they succeeded in getting the vessel up to the bridge pier of

the defendants, or near it, at four o'clock in the morning. Her bow, as the master states, was still thirty or forty feet from the pier; and he says he bought the new line and employed the additional help to heave the vessel up to the pier, which was not fully accomplished until ten o'clock in the forenoon. Seeing that the wind and sea had increased in the meantime, they then concluded to make her fast to the pier; and, accordingly, got out the chain and fastened it to a pile on the opposite side of the pier, using, for that purpose, the hawsers and lines previously got out to work the vessel up to the pier. About twelve o'clock the vessel commenced pounding, and the pile to which the chain was attached started and passed through the pier eight or ten feet, and the clear inference from the testimony is, that all the fastenings gave way, except the new line and the chain.

Another witness, examined by the plaintiff, states that when the vessel commenced pounding, the pier began to start; and he says it was two o'clock in the afternoon when the pile to which the chain was attached gave way. Although it gave way, it did not then pass entirely through the bridge pier, but lodged against other piles on which the pier was built; and, consequently, the chain would still assist in holding the vessel, unless the pile broke, or that part of the pier was carried away. At this juncture, one of the defendants came upon the pier and directed the master to get the vessel away from the pier, informing him that if he did not he would cast her adrift; to which the master replied, that he would leave, if possible; and if not, he would continue to hold on to the bridge pier. But he did not make any attempt to leave, and a person in the employment of the defendants cut the hawser. When the hawser was severed, and the strain came upon the chain, the second mate of the vessel says the rest of the piles gave way, and the vessel went over to the south bridge pier, carrying away her stanchions and bulwarks on her larboard side; and, to prevent further damage, she was scuttled, by the order of the master, and presently sunk. Such is the substance of the testimony introduced by the plaintiffs, as reported in the bill of exceptions. Several prayers for instructions to the jury

were presented by the defendants, but, in the view we have taken of the case, it will only become necessary to refer to the second, and to the response given thereto by the court. By the second prayer of the defendants, the court was requested to instruct the jury, that if they believed, from the evidence, that it was material for the preservation of the pier to cut the vessel loose from it, the persons in charge of the pier had a right to do so, as against all rights of property in the vessel, after reasonable notice given, and request made and refused for the vessel to leave. But the court refused to give the instruction, as requested, and charged the jury, in substance, as follows: That if the vessel was attached to the pier towards its outer end, and was in peril, the owner of the pier could not put the vessel in greater peril by cutting her loose for the safety or protection of the pier. He also told the jury that the pier was run out into the lake for the accommodation of commerce, and was used as private property in public business; that the vessel was liable for such damage as she was doing the pier; and that the owners of the pier were not justifiable or excusable for cutting the vessel loose, even if it was material for them to do so for the safety or protection of the pier, or of that part to which the vessel was attached. Under the instructions of the court, the jury returned their verdict in favor of the plaintiffs, and the defendants excepted to the instructions given, and to the refusal of the court to instruct the jury as requested.

It is insisted by the defendants, that the District Judge erred, as well in his refusal to instruct the jury as requested, as in the instructions given.

On the part of the plaintiffs, both of those propositions are controverted; and they contend, in the first place, that the bridge pier was a nuisance, because, as they insist, it was an obstruction to the public right of navigation; and secondly, they contend that the defendants had no right to cut the hawser, and cast the vessel adrift, however necessary it was for them to do so, for the safety and protection of the bridge pier, because, as they insist, the defendants, by erecting the pier in the waters of the lake, had impliedly licensed the plaintiffs,

and all others navigating those waters, to come there with their vessels, and moor them to the pier; and that the license, of necessity, includes the right to use the pier, according to the exigencies of the case.

1. Unless it be true, that every landing place and bridge pier erected on the shore of navigable waters without a special authority from the legislature, is necessarily a nuisance, it is a sufficient answer to the first position of the plaintiffs to say, that there was not a particle of evidence in the case to support the theory of fact on which the proposition is based. All that appeared upon the subject in the court below was, that the bridge pier in question extended several hundred feet into the waters of the lake; but it was not even suggested that any less extension would have answered the purpose for which the pier was constructed, or that it was any greater than is usual in similar erections on that shore of the lake, or that the pier, as constructed, constituted any obstruction whatever to the public right of navigation. On the contrary, the court adopted the theory that the vessel or her owners would be liable for the damage done to the pier, and sustained the right of the plaintiffs to recover, entirely upon the ground that the peril of the vessel justified the master in refusing to leave; and that the defendants, whatever might be the consequences to the pier if the vessel remained, had no right to cut the hawser, and thereby expose her to greater danger, notwithstanding they were in the possession of the pier, and it was admitted that it was their private property. Bridge piers and landing places, as well as wharves and permanent piers, are frequently constructed by the riparian proprietor on the shores of navigable rivers, bays, and arms of the sea, as well as on the lakes; and where they conform to the regulations of the State, and do not extend below low-water mark, it has never been held that they were a nuisance, unless it appeared that they were an obstruction to the paramount right of navigation. Whether a nuisance or not is a question of fact; and where they are confined to the shore, and no positive law or regulation was violated in their erection, the presumption is that they are not an obstruction, and he who alleges the contrary must prove it. Wharves,

quays, piers, and landing places, for the loading and unload ing of vessels, were constructed in the navigable waters of the Atlantic States by riparian proprietors at a very early period in colonial times; and, in point of fact, the right to build such erections, subject to the limitations before mentioned, has been claimed and exercised by the owner of the adjacent land from the first settlement of the country to the present time. (Ang. on Tide Wat., p. 196.)

Our ancestors, when they immigrated here, undoubtedly brought the common law with them, as part of their inheritance; but they soon found it indispensable, in order to secure these conveniences, to sanction the appropriation of the soil between high and low-water mark to the accomplishment of these objects. Different States adopted different regulations upon the subject; and, in some, the right of the riparian proprietor rests upon immemorial local usage. No reason is perceived why the same general principle should not be applicable to the lakes, although those waters are not affected by the ebb and flow of the tide; and, consequently, the terms "high and low-water mark" are not strictly applicable. But the lakes are not navigable, in any proper sense, at least in certain places, for a considerable distance from the margin of the water. Wherever the water of the shore, so to speak, is too shoal to be navigable, there is the same necessity for such erections as in the bays and arms of the sea; and where that necessity exists, it is difficult to see any reason for denying to the adjacent owner the right to supply it; but the right must be understood as terminating at the point of navigability, where the necessity for such erections ordinarily ceases.

2. Piers or landing places, and even wharves, may be private, or they may be in their nature public, although the property may be in an individual owner; or, in other words, the owner may have the right to the exclusive enjoyment of the structure, and to exclude all other persons from its use; or he may be under obligation to concede to others the privilege of landing their goods, or of mooring their vessels there, upon the payment of a reasonable compensation as wharfage; and whether they are the one or the other may depend, in case

of dispute, upon several considerations, involving the purpose for which they were built, the uses to which they have been applied, the place where located, and the nature and character of the structure. Undoubtedly, a riparian proprietor may construct any one of these improvements for his own exclusive use and benefit; and, if not located in a harbor, or other usual resting place for vessels, and if confined within the shore of the sea or the unnavigable waters of a lake, and it had not been used by others, or held out as intended for such use, no implication would arise, in a case like the present, that the owner had consented to the mooring of the vessel to the bridge pier.

Looking at the statement of the facts, as derived from the evidence reported in the bill of exceptions, it is obvious, that every one of the foregoing conditions substantially concur in this case; and, consequently, it must be assumed that the master attached the vessel to the pier without any authority from the defendants, either express or implied. He had no business to transact with the plaintiff, and the vessel was not going to the pier for freight; so that all pretence of a license utterly fails.

That fact alone, however, under the circumstances of this case, might not perhaps be sufficient to justify or excuse the defendants for cutting the hawser. Every man is bound by law so to use his own property as not to injure the property of another; and, unless the defendants are brought within the fair operation of that rule, they cannot be justified or excused. But that rule is applicable to the plaintiffs as well as to the defendants; and he who would invoke the benefit of the rule must first comply with its requisitions.

Failing to show a license to attach the vessel to the pier, the plaintiffs set up the peril of the vessel, and insist that she had a right to remain, notwithstanding the request to leave, during its continuance; and, consequently, that the defendants cannot be justified or excused for cutting her loose.

Suppose the right to remain during the continuance of the peril, if she could have done so without danger or injury to the property of the defendants, be admitted, still the admission

would not benefit the plaintiffs in this case, for the reason that they or their agent had wrongfully attached the vessel to the pier; and when it became obvious that the necessary effect of the trespass, if suffered to be continued, would be to endanger and injure, or perhaps destroy the pier, the peril of the vessel imposed no obligations upon the defendants to allow her to remain, and take the hazard that their own property would be sacrificed in the effort to save the property of wrong-doers. On the contrary, they had a clear right to interpose, and disengage the vessel from the pier to which she had been wrongfully attached, as the only means in their power to relieve their property from the impending danger. They had never consented to incur that danger, and were not in fault on account of the insufficiency of the pier to hold the vessel, because it had not been erected or designed as a mooring place for vessels in rough weather, and it was the fault of the plaintiffs or their agent that the vessel was placed in that situation.

Reference is made by the plaintiffs to the case of *Heaney et al.* vs. *Heeney et al.*, (2 Den., 625,) as asserting a contrary doctrine; but, after a careful examination of the case, we think it will not bear any such construction. Recurring to the facts of the case, it will be seen that the litigation arose out of a dispute about the title of the dock before it was completed. With a view to get possession of the dock, the plaintiffs attached their vessel to it, and the defendants, who had previously had the possession, severed the fastenings and cast her loose at a time when there was no danger whatever to the dock; and it was held that, inasmuch as the occupancy of the plaintiffs was lawful, the defendants could not terminate it by setting the vessel adrift, so as to endanger her safety, until they had put the plaintiffs in fault. But the court admitted that, if the entry of the plaintiffs into the dock had been tortious, then, indeed, the defendants would have had a right to cut her loose, doing no unnecessary damage, in order to the enjoyment of their rights.

In view of the whole case, we are of the opinion that the second prayer for instruction, presented by the defendants, should have been adopted by the court, and that the instruc-

tions given to the jury in answer to their request were also erroneous.

*Judgment of the District Court reversed, with costs, and the cause remanded, with directions to issue a venire facias de novo.*