The **CONFEDERATED SALISH AND KOOTENAI TRIBES** et al., Plaintiffs,

v.

**James M. NAMEN** et al., and City of Polson, a Montana municipal corporation, Intervener, Defendants.

Civ. No. 2343.

United States District Court, D. Montana, Missoula Division.

Aug. 14, 1974.

---

Richard A. Baenen of Wilkinson, Cragun & Barker, Washington, D. C., and Victor F. Valgenti, Missoula, Mont., for plaintiffs.

Poore, McKenzie, Roth, Robischon & Robinson, Butte, Mont., for defendants.

Christian, McCurdy, Ingraham & Wold, Polson, Mont., for intervenor City of Polson.

Boone, Karlberg & Haddon, Missoula, Mont., for the Flathead Lakers, Inc.

JAMESON, District Judge.

The plaintiffs, The Confederated Salish and Kootenai Tribes of the Flathead Reservation (Tribes) and Harold W. Mitchell, Jr., chairman of the Tribal Council, instituted this action for declaratory and injunctive relief against the defendants, James M. Namen, Barbara J. Namen, A. J. Namen, and Kathryn Namen, the owners of land located in Polson, Montana on the south half of Flathead Lake, which is a part of the Flathead Indian Reservation. Plaintiffs seek a judgment declaring that "the defendants are in trespass upon plaintiffs' land to the extent that they maintain and have erected buildings and structures beyond the high water mark * * * of Flathead Lake and encroach on the bed and banks of said Lake".[1] They ask the court to enjoin all further trespass and that "defendants be directed to immediately remove all buildings and structures, including landfills, that extend beyond" the high water mark and that the lands below the high water mark "be restored to their original condition".

Defendants filed a motion to dismiss for failure to state a claim. Plaintiffs filed a motion for summary judgment. The City of Polson was permitted to intervene and filed an answer.[2] Flathead Lakers, Inc. was granted leave to file a brief as amicus curiae.[3]

At a hearing on March 22, 1974 the parties agreed upon most of the facts essential to a determination of the pending motions and were granted time for further discovery and supplemental briefs. The court suggested that the motion of the defendants to dismiss be considered a motion for summary judgment. The defendants and intervener[4] have now agreed that their motions to dismiss may be considered as motions for summary judgment pursuant to the provisions of Rules 12(b) and 56 of the Federal Rules of Civil Procedure.

---

1. The complaint alleged a high water mark "elevation of 2893.2 feet". The parties were unable to agree upon the elevation. At a hearing on March 22, 1974 plaintiffs agreed that for the purpose of this action any reference to a stated elevation "should be considered altered to merely state at the high-water mark at whatever it may be".

2. The motion to intervene recited, *inter alia*, that the City of Polson owns land fronting the south half of Flathead Lake, on which it has developed a recreational area, with public docks used for swimming and boating; that the dock is located on land between high and low water marks of the Lake; that the City has levied taxes against the dock, boat house and wharf facilities of the defendants.

3. An affidavit in support of the petition to file brief recited that The Flathead Lakers, Inc., is a non-profit corporation having in excess of 2,000 members, with a very substantial part of the members owning real property fronting on the shores of the south half of Flathead Lake.

4. The answer of the City of Polson included a motion to dismiss for failure to state a claim.

All parties have conducted extensive discovery and have filed comprehensive and well considered briefs. The court is satisfied that there is no genuine issue as to any material fact with respect to the primary issue of whether the defendants as owners of property riparian to the south half of Flathead Lake have the riparian rights of access and wharfage.

## Statement of Facts

The following facts are not disputed by any of the parties:

(1) The plaintiff Tribes are a confederation of American Indian Tribes organized pursuant to the Indian Reorganization Act of June 18, 1934, 48 Stat. 984, 25 U.S.C. § 461 et seq., with a governing body recognized by the Secretary of the Interior. The plaintiff Mitchell is an enrolled member of the Tribes and is chairman of the Tribal Council.

(2) The Flathead Reservation was created pursuant to the Treaty of Hellgate, July 16, 1855, 12 Stat. 975, reserving for the plaintiff Tribes the land embraced by the following boundaries:

"Commencing at the source of the main branch of the Jocko River; thence along the divide separating the waters flowing into the Bitter Root River from those flowing into the Jocko to a point on Clarke's Fork between the Camash and Horse prairies; thence northerly to, and *along the divide bounding on the west the Flathead River, to a point due west from the point half way in latitude between the northern and southern extremities of the Flathead Lake;* thence on a due east course to the divide whence the Crow, the Prune, the So-ni-el-em and the Jocko Rivers take their rise, thence southerly along said divide to the place of beginning." (Emphasis added).

(3) In 1908 the United States, pursuant to the Act of April 23, 1904, 33 Stat. 302, as amended, allotted to Antoine Morias (Indian Allotment No. 1378) the following lands within the Reservation:

"The Lot one, the east half of the Lot two, and the southeast quarter of the southeast quarter of section three in Township twenty-two north of Range twenty west of the Montana Meridian, Montana, containing seventy-five and forty-two-hundredths acres."

These lands are riparian to the south half of Flathead Lake, which is a navigable body of water. The south half of Flathead Lake was included in the lands reserved to the Tribes by the Treaty of Hellgate.

(4) The defendants, James M. Namen, Barbara J. Namen, A. J. Namen, and Kathryn Namen are the owners in common through successive conveyances of portions of the Morias allotment described as the east half of Lot 2, Section 3, Township 22 North, Range 20 West, Montana Principal Meridian.

(5) The defendant James M. Namen operates a business known as Jim's Marina, Polson, Montana on these riparian lands, and "as proprietor of Jim's Marina has erected and maintained certain buildings and structures which extend beyond the high-water mark of the lake and encroach on the bed and banks of Flathead Lake". Among the structures which extend beyond the high water mark are: (a) docks, wharves and piers; (b) a breakwater built in 1973; and (c) a storage shed.

(6) The breakwater extends for some distance into the lake below high water mark. "The width of the breakwater, from water line to water line is approximately 16 feet, and the sides of the breakwater descend at an angle so that the width of the breakwater along the bed of the lake is in excess of 16 feet."

(7) The marina and assorted structures that encroach on the bed and banks of the lake below high water mark are utilized for business or commerce in connection with Flathead Lake.

(8) During the period from "around the turn of the century into at least the 1920's, Flathead Lake was used at various times and on various occasions for commerce; * * * boats and related

water vehicles traveled the lake from one end to the other."

(9) Wild Horse and Cromwell Islands lie within the south half of Flathead Lake. All lands on Wild Horse Island were conveyed under the allotment act of 1904 (33 Stat. 302) as amended.

For the purpose of considering the pending motions the court also concludes as a matter of law:

■ (1) The land within the original boundaries of the reservation, including the land owned by the defendants and the south half of Flathead Lake, is still part of the Flathead Reservation.[5]

■■ (2) The allotment of Antoine Morias conveyed title only to the high water mark of Flathead Lake, and the high water mark is the boundary of the defendants' property.[6]

■ (3) Since the time of the Treaty of Hellgate, the United States has held and still holds the bed and banks of Flathead Lake below high water in trust for the plaintiff Tribes.[7]

### Contentions of Parties

Defendants and intervener claim a right of access to Flathead Lake, together with the concomitant right to construct and maintain "dock, wharf and pier facilities" on the bed and banks of the south half of Flathead Lake below high water mark. They contend that the estate reserved to the Tribes in the south half of Flathead Lake by the Treaty of Hellgate is not absolute. Rather, they contend, (1) the riparian rights of wharfage may be implied from provisions of the Hellgate Treaty and the Treaty of the Upper Missouri; (2) the estate reserved to the Tribes has been limited by allotment and settlement statutes which manifested a Congressional intent "to grant riparian rights which accompany lakeshore property"; and (3) the owners of lands riparian to Flathead Lake acquired under the allotment and settlement statutes are entitled to the riparian rights of access and wharfage under federal common law doctrine.

Plaintiffs contend that as the beneficial owners of the bed and banks of the lake below high water mark, they have the right to control the use of that land. They argue that no rights below the high water mark were ever extended to the owners of riparian lands by either treaty or statute. Finally, they contend that federal common law principles of riparian rights are not applicable, but rather that tribal law is controlling and the Tribes have never granted riparian rights to owners of lakeshore property.

---

5. It is clear from Mattz v. Arnett, 412 U.S. 481, 93 S.Ct. 2245, 137 L.Ed.2d 92 (1973) and 18 U.S.C. 1151, that all lands embraced within the original boundaries of the Flathead Reservation are still part of that Reservation, even though parts of the reservation were opened to settlement by non-Indians under various land acts. The "reservation is located in four counties of the state, Missoula, Lake, Sanders and Flathead, and consists of approximately 1,250,000 acres of which 615,418 acres is trust land. The total resident membership of the tribe is 19 percent of the total population living within the exterior boundaries of the reservation." Security State Bank v. Pierre, 511 P.2d 325, 326 (Mont.1973).

6. As was stated in Montana Power Co. v. Rochester, 127 F.2d 189, 192 (9 Cir. 1942), a case involving a boundary dispute on Flathead Lake: "The general rule, of course, is that patents of the United States to lands bordering navigable waters, in the absence of special circumstances, convey only to high water mark".

7. As the court said in Rochester, supra at 191, "Whether the ownership was originally in the Indians or in the United States, it is certain that by the treaty the United States undertook to hold title to the reserved area, including the bed of the southerly half of the lake, in trust for the confederated tribes." The defendants admit for the purpose of their own motion that the United States holds title to the bed and banks of Flathead Lake below the high water mark in trust for the Tribes. Questioning the rationale of Rochester, defendants refuse to make this admission for the purpose of plaintiffs' motion. This court holds, as it did in United States v. Pollmann, 364 F.Supp. 995, 999 (D.Mont.1973), that Rochester is controlling.

*Hellgate Treaty and Treaty of Upper Missouri*

Defendants contend that the riparian right of wharfage may be implied from certain provisions in the Hellgate Treaty and the Treaty of the Upper Missouri. The court cannot agree.

Article III of the Hellgate Treaty provides in part:

"That if necessary for the public convenience roads may be run through the said reservation; and, on the other hand, the right of way with *free access* from the same to the nearest public highway is secured *to them*; as also the right in common with citizens of the United States to travel upon all public highways." (Emphasis added).

 It is true, as defendants point out, that under 43 U.S.C. § 931 navigable rivers are "deemed public highways" and under 22 U.S.C. § 10 the navigable rivers and waters within the Louisiana Purchase are "public highways". However, when Article III refers to securing free access to the public highway "to them", it is not clear whether the word "them" refers to the public in general or to members of the Tribe. After providing for roads for the public convenience, the article continues with the phrase "on the other hand". The language following may reasonably be construed as referring to members of the Tribe. Doubtful expressions must be resolved in favor of the Indians. Carpenter v. Shaw, 280 U.S. 363, 367, 50 S.Ct. 121, 74 L.Ed. 478 (1930); McClanahan v. Arizona State Tax Commission, 411 U.S. 164, 93 S.Ct. 1257, 36 L.Ed.2d 129 (1974). The provision for right of free access to public highways must therefore be found to be for the benefit of members of the Tribes.

 Even if "them" were interpreted to mean the general public, it would be improper to construe the term "public highway" in the Treaty as including the south half of Flathead Lake. As stated in Carpenter v. Shaw, *supra,*

" 'The language used in treaties with the Indians should never be construed to their prejudice. If words be made use of, which are susceptible of a more extended meaning than their plain import, as connected with the tenor of the treaty, they should be considered as used only in the latter sense.' Worcester v. The State of Georgia, 6 Pet. 515, 582 [31 U.S. 515, 8 L.Ed. 483] . . . And they must be construed, not according to their technical meaning, but 'in the sense in which they would naturally be understood by the Indians.' Jones v. Meehan, 175 U.S. 1, 11 [20 S.Ct. 1, 44 L.Ed. 49]." *Id.*

The court agrees with the plaintiffs that to construe public highway to include the southern half of Flathead Lake "requires a finding that the unlettered Indians in 1855 understood 'road' to mean 'water' and that one of the 'roads' that *might* be run through their Reservation was already there and was 180 square miles large". Such an interpretation is clearly forbidden by *Shaw* and numerous subsequent decisions.

The Treaty of the Upper Missouri, 11 Stat. 657, was entered into on October 17, 1855 (three months subsequent to the Hellgate Treaty) between the United States and a number of tribes, including the Flathead, Upper Pend d'Oreilles and Kootenai.[8]

Article VIII of the Treaty provides:

"For the purpose of establishing travelling thoroughfares through their country, and the better to enable the President to execute the provisions of this treaty, the aforesaid nations and

---

8. While the Flatheads and Nez Perce tribes were parties to this treaty, it was concerned primarily with the establishment of the Blackfeet Reservation, "the definition of [its] boundaries, the prevention of disputes among the tribes, and the establishment of peace". Colliflower v. Garland, 342 F.2d 369, 371 (9 Cir. 1965). See also Blackfeet and Gros Ventre Tribes, 127 Ct.Cl. 807, 809, 119 F.Supp. 161, 162 (1954), cert. denied, 348 U.S. 835, 75 S.Ct. 58, 99 L.Ed. 658 (1914).

tribes do hereby consent and agree, that the United States may, within the countries respectively occupied and claimed by them, construct roads of every description . . . *and that the navigation of all lakes and streams shall be forever free to citizens of the United States.*" (Emphasis added).

▉ Defendants contend that this provision, especially the last clause, supports their claim to the riparian right of wharfage. This provision, however, is nothing more than a recognition of the public's right of navigation. The public's right of navigation and the riparian owners' wharfage rights are separate and distinct rights. The latter do not automatically derive or result from the former. The right of wharfage is a private right which is not everywhere recognized, whereas the right of navigation is a public right which all jurisdictions respect and which is superior to the right of wharfage. See Yates v. Milwaukee, 77 U.S. 497, 19 L.Ed. 984 (1871); 1 Wiel, Water Rights in the Western States, Section 904, p. 942 (3rd ed. 1911); 1 Clark, Waters and Water Rights, Section 37.2(c) pp. 209–210 (1967). The court agrees with plaintiffs that the Treaty of the Upper Missouri "does not speak to riparian rights below high water mark of any navigable lake or stream", and although it "might be applicable to a boating case involving Flathead Lake, here * * * it is irrelevant".

*Effect of Allotment Acts and Other Congressional Enactments*

▉ Defendants next argue that, under the General Allotment Act of 1887 and the 1904 Allotment Act and its numerous amendments, it is evident "that Congress intended those owners fronting on the lake to own and possess all water rights in and to Flathead Lake which a normal riparian owner would possess", and that these riparian rights include the right to erect boating and wharf facilities. In determining the effect of

the Congressional Acts it is recognized that while the power to abrogate treaty rights exist, "the intention to abrogate or modify a treaty is not to be lightly imputed to the Congress". Pigeon River Co. v. Cox Co., 291 U.S. 138, 160, 54 S. Ct. 361, 367, 78 L.Ed. 695 (1934), quoted in Menominee Tribe v. United States, 391 U.S. 404, 413, 88 S.Ct. 1705, 20 L. Ed.2d 697 (1968). On the other hand, although statutes terminating or limiting treaty rights "should be construed narrowly", the courts "cannot ignore the intention of Congress where it is perfectly plain". United States v. Seaton, 101 U.S.App.D.C. 234, 248 F.2d 154, 155 (1957).

With the enactment of the General Allotment Act of 1887 (24 Stat. 388) the Federal Government commenced a general policy of alloting tribal lands within the various reservations to individual Indians. Generally, this system provided for the grant of a specified number of acres, with the grant held in trust for a period of 25 years, after which the allottee was issued a patent in fee. The Act authorized the Secretary of the Interior to prescribe rules and regulations deemed necessary to secure a joint and equal distribution of waters for irrigation, whether or not the lands were riparian. See United States v. Power, 305 U.S. 527, 533, 59 S.Ct. 344, 83 L.Ed. 330 (1939).

The allotment system was specifically applied to the Flathead Reservation by the Act of April 23, 1904, 33 Stat. 302, which provided for the survey and allotment of the lands within the Reservation and the sale and disposal of surplus lands remaining after allotment. Following allotment, a commission was appointed by the President to inspect, appraise and value unallotted lands and to classify the lands as agricultural, timber, mineral or grazing lands. The unallotted lands were then open to settlement and entry by Presidential proclamation and disposed of "under the homestead, mineral, and town-site laws of the United States" which speak of "rights to the use of water for mining,

agricultural, manufacturing, or other purposes". 30 U.S.C. § 51.

The Allotment Act of 1904 was subsequently amended on a number of occasions to further implement the policy of allotment and settlement on the Flathead Reservation.[9] The Act of June 21, 1906, 34 Stat. 325, 354 provided for the surveying and platting of town-sites at various settlements within the Reservation, and added Section 19 to the 1904 Act to provide that nothing in the Act should be construed to deprive "any of said Indians, or said persons or corporations to whom the use of land is granted by the Act" of water appropriated and used for irrigation and domestic purposes.

By the Act of May 29, 1908, 35 Stat. 444, Congress provided that alloted lands "which can be .sold under existing law * * * may be sold on the petition of the allottee", and "That upon the approval of any sale hereunder by the Secretary of the Interior he shall cause a patent in fee to issue in the name of the purchaser for the lands so sold * * *."

In the Villa Sites Act of 1910, 36 Stat. 296–297, Section 23 was added to the 1904 Act, providing for the survey and subdivision into two to five acre lots of "all of the unallotted lands fronting on Flathead Lake * * * that are embraced within the limits of the Flathead Indian Reservation" and for sale thereof "to the highest bidder at public sale". An advertising circular issued by the Department of the Interior in connection with the sale of the Villa Sites stated that "The lake is utilized for bathing, sailing, boating, and yachting, and several steamboats ply between the various towns upon its borders. The shores are well adapted for boat landings and the erection of wharves." This circular also recited that "Trains from Kalispell, on the Great Northern Railway, connected Somers for the morning trips of the steamers over the lake to Polson, and from Somers to Big Arm by way of Dayton, Elmo, and many other wharf landings on the western shore." [10]

The Act of 1904 was amended in 1911 (36 Stat. 1066) and 1912 (37 Stat. 527) to provide that patents for all tracts of land on Flathead Lake should be subject to easements for storage for irrigation or development of water power. A further amendment in 1919 (40 Stat. 1203) provided that the Secretary of the Interior designate surplus lands bordering on streams within the Flathead Reservation as "valuable for stock-watering purposes", and dispose of the lands under the terms of the 1904 Act.[11]

None of the Acts, or amendments thereto, in express terms grant riparian rights to the owners of the lake frontage property.[12] Nor do they contain any ex-

9. The Act was amended in 1905, 33 Stat. 1048, 1081 to provide for a grant to the State of Montana for the use of the University of Montana for biological station purposes. That station is located on the banks of the south half of Flathead Lake.

10. The Report of the Committee on Indian Affairs on Senate Bill 3983, the Villa Sites Act, submitted by Senator Dixon of Montana, reads in pertinent part:
"The Flathead Indian Reservation has been surveyed and allotments made to all of the Indians holding tribal relations with the Flathead Indians. The bill in question proposes to survey and subdivide into small lots for summer-residence sites the entire unallotted lands fronting on Flathead Lake, the proceeds from the sale of these lots to be used in furthering the reclamation of the allotted Indians' lands which is now being carried on. The lands fronting on this lake are of little agricultural value, and it is believed that a large amount of money can be realized from the sale of the lake frontage; much more than can be realized under the present status of these lands, opening them to settlement. * * * Your committee is of the unanimous belief that the proposed legislation is most meritorious and for the benefit of the Flathead Indians." Sen. Rep.No.17, 61st Cong. 2d Session.

11. The allotment system and policy of settlement of unallotted lands was terminated by Congress in the Wheeler-Howard (Indian Reorganization) Act of June 18, 1934, 48 Stat. 984, under which the Tribes were organized.

12. The express provisions in all of the Acts relating to water rights are concerned with the use of water for agriculture, mining, manufacturing or power purposes.

press reservation or exception with respect to these rights. The crucial question then is whether these acts, when viewed in the context of long established common law principles governing riparian rights, indicate that Congress intended the grants of riparian lands pursuant to the allotment acts to convey the rights of access and wharfage.

*Applicability of Federal Common Law Rules with Respect to Riparian Wharfage Rights on Navigable Waters*

The nature and extent of riparian rights, if any, in the bed and banks of navigable waters is generally a matter of state law. This is a consequence of the rules that (1) the United States holds title to the bed and banks of navigable waters in trust for future states; and (2) upon admission of a state to the Union, the United States relinquishes to the state the ownership of the bed and banks of its navigable waters. See Shively v. Bowlby, 152 U.S. 1, 48–49, 14 S.Ct. 548, 38 L.Ed. 331 (1894). The south half of Flathead Lake presents an exception. Title to the bed and banks of the south half of Flathead Lake below high water mark is held by the United States in trust for the Tribes. Thus, the basis for state determination of riparian rights is non-existent. State law, therefore, is not applicable.

The federal common law with respect to the riparian rights of access and wharfage is clear. Following a long line of earlier cases, the Supreme Court in United States v. River Rouge Improvement Co., 269 U.S. 411, 418, 46 S.Ct. 144, 146, 70 L.Ed. 339 (1926) stated:

"It is well settled that in the absence of a controlling local law otherwise limiting the rights of a riparian owner upon a navigable river, Shively v.

Bowlby, 152 U.S. 1, 40 [14 S.Ct. 548, 38 L.Ed. 331], he (the riparian owner) has, in addition to the rights common to the public, *a property right, incident to his ownership of the bank, of access from the front of his land to the navigable part of the stream, and when not forbidden by public law may construct landings, wharves or piers for this purpose."* (Citations omitted), (emphasis added).

There are few decided cases involving the riparian rights of access and wharfage as they relate to federally held beds of navigable waters. Those cases which have considered the question, however, consistently recognize these riparian rights.

In Potomac Steamboat Co. v. Upper Potomac Steamboat Co., 109 U.S. 672, 683, 3 S.Ct. 445, 27 L.Ed. 1070 (1884) the Supreme Court, quoting from Yates v. Milwaukee, *supra* (77 U.S. 497, 10 Wall. 497, 19 L.Ed. 984 at 986), stated that among the rights to which a riparian owner on the navigable Potomac River is entitled are:

" 'Access to the navigable part of the river from the front of his lot, the right to make a landing, wharf or pier for his own use or for the use of the public, subject to such general rules and regulations as the Legislature may see proper to impose for the protection of the rights of the public, whatever those may be.' " [13]

This same rule was applied in the former Territory of Alaska. As was stated in Ketchikan Spruce Mills v. Alaska Concrete Prod. Co., 113 F.Supp. 700, 701–702 (D.Alaska 1953): "It is well established that a right of access * * * is a property right and may be exercised by constructing a wharf, pier or dock over the intervening tide lands to the navigable waters."[14]

13. See also Martin v. Standard Oil of New Jersey, 91 U.S.App.D.C. 84, 198 F.2d 523, 526 (1952) ; United States v. Groen, 72 F. Supp. 713, 720 (D.D.C.1947) ; and United States v. Belt, 79 U.S.App.D.C. 87, 142 F.2d 761, 767 (1944).

14. See also Worthen Lumber Mills v. Alaska Juneau Gold Mining Co., 229 F. 966, 970 (9 Cir. 1916) ; Dalton v. Hazelez, 182 F. 561, 573 (9 Cir. 1910) ; Decker v. Pacific Coast S.S. Co., 164 F. 974, 976 (9 Cir. 1908) ; and Columbia Canning Co. v. Hampton, 161 F. 60, 64 (1908).

Plaintiffs do not question the existence or propriety of these federal common law rules, but argue that they are not applicable because: (1) the Tribes, like states, have control over the beds and banks of navigable waters, and the "Tribes have not authorized the erection or maintenance of defendants' structures . . ."; (2) "The United States, acting in its supervisory capacity as trustee, has consistently recognized the Tribes' * * * right to assert full jurisdiction and control over wharfage rights along the lake;" (3) the lands involved are Indian trust lands which the Treaty of Hellgate reserved for the "exclusive use and benefit" of the Tribes; and (4) in allotting and authorizing the conveyance of tribal lands, Congress did not expressly grant riparian rights and such a grant cannot be implied.

### (1) Applicability of Tribal Law

Plaintiffs contend that tribal law and not federal law governs the use of the bed and banks of the south half of Flathead Lake. This contention is based in part upon a suggested analogy to the rule of Shively v. Bowlby, *supra*. According to *Shively*, prior to admission of a state into the Union, the beds and banks of navigable waters are held by the United States in trust for the future state. Upon admission, the new state receives full legal ownership of the beds and banks of its navigable waters. As a result, state law governs the questions of ownership, use and control of the bed, including wharfage rights. Plaintiffs argue that the Tribes stand in the same position as a state with respect to the ownership and control over the bed and banks of the south half of Flathead Lake.

The analogy, however, is faulty. While a state has legal title to the bed and banks of its navigable waters, the Tribes do not. Rather, title to the bed and banks of the south half of Flathead Lake is held by the United

States in trust for the Tribes. Congress has the power to grant title or rights in the bed and banks of the Lake as well as any other interests in Indian trust lands. Congress has no such power *vis-a-vis* the states. Moreover, barring Congressional action, the Tribes can never secure legal ownership as a state does. If analogies are to be drawn, therefore, the Tribes' position is more nearly that of a territory than of a state. Applying the principles of *Shively*,[15] *Potomac Steamboat Co.*, and *Ketchikan Spruce Mills*, the court concludes that federal law is applicable. As discussed *supra*, the federal courts have consistently recognized the riparian rights of access and wharfage with respect to federally held beds and banks of navigable waters.

Plaintiffs, in their reply brief of February 12, 1974 further buttress their argument that tribal law is controlling by quoting extensively from McClanahan v. Arizona State Tax Commission, *supra*. There the Court discussed at length the Indian sovereignty doctrine, reaffirming prior holdings that the Federal Government has largely permitted the Indians "to govern themselves, free from state interference", and that the Indian reservations were meant to establish the "exclusive sovereignty" of the Indians "under general federal supervision". Plaintiffs recognize that *McClanahan* was concerned with the applicability of state law to a reservation and its Indian inhabitants, a question not here presented, but argue that the principles there enunciated are fully applicable.

The court cannot agree. In the complex, and sometimes uncertain, area of Indian law, care must be exercised in attempting to apply language used in one factual situation in a totally different context. *McClanahan* was concerned with the right of a state to impose a tax upon income earned by an Indian on a reservation. Here we are concerned with the rights of both individual Indians and their non-Indian grantees under

---

15. Shively v. Bowlby, recognizes the right of the United States to grant title or rights in the land below the high water mark of navigable waters prior to statehood.

grants by the Federal Government pursuant to Congressional action. There can be no doubt that the authority of the Federal Government is superior to that of the Tribe.[16] Congress was exercising that authority in enacting the Allotment Acts. We are concerned then with the intent of Congress with respect to riparian rights in providing for the allotment and sale of lands fronting on a navigable lake.

### (2) Federal Recognition of Tribal Jurisdiction

██ ██ In support of their contention that no riparian rights of the nature claimed by defendants were conveyed by the Federal Government, plaintiffs direct the court to two letters—one dated August 16, 1955 from the Acting Commissioner of Indian Affairs to Senator Mansfield, and the other dated February 18, 1959 from an Assistant Commissioner to the chairman of the Tribal Council.[17] Both letters concern the right of the Tribes to grant leases or permits for the use of lands below high water mark on the south half of Flathead Lake. They indicate that the Tribes have complete authority to regulate the use of those lands. While it is true that interpretations of a law by the agency responsible for its enforcement are to be given deference, Udall v. Tallman, 380 U.S. 1, 18, 85 S.Ct. 792, 13 L. Ed.2d 616 (1965), the letters are not persuasive. Both letters were written almost a half century after the initial allotments and conveyances of the land.[18] Neither letter considers the federal common law principles with respect to access and wharfage. Nor does either letter deal expressly with the effect of prior allotments and conveyances of riparian lands pursuant to the Allotment Acts. More persuasive in determining Congressional intent is the legislative history of the Villa Sites Act (see note 10), as well as the bulletin issued by the Secretary of the Interior in connection with the sale of the Villa Sites, stating that Flathead Lake "is utilized for bathing, sailing, boating, and yachting, and several steam boats ply between the various towns upon its borders. The shores are well adapted for boat landings and the erection of wharves."[19]

16. Plaintiffs "agree the United States has a power paramount to that of the Tribes over tribal lands and waters and the United States, by clear Act of Congress, can exercise that power to the derogation of the tribal power". They contend, however, that "here the United States has not so acted, and, therefore, the power to regulate the use of tribal land and water resided unimpaired in the Tribes". (Plaintiffs' Supplemental Memorandum filed May 15, 1974).

17. The first letter recites that under *Rochester* the title to the bed and banks of the south half of Flathead Lake below high water mark "is in the United States in trust for the Conferedated Tribes," and that "It is therefore within the power of Confederated Tribes to lease these drawdown lands * * *". The second letter similarly states that title of the lands is in the United States in trust for the Indians and that "either leases or permits may be used in granting the use of tribal lands for dock sites or piers, across the flowage easement and into the permanent lake pool".

18. Moreover, it appears from affidavits of Namen and one of his predecessors in interest that at least since 1948 "the shore and banks thereof" have been used for "docks, wharf and pier purposes". An affidavit filed by Intervener, City of Polson, recites that a lumber mill was constructed in 1909 on allotted land "located about 100 yards from the West boundary line of the Morias allotment", and that "lands between the high water mark of and the bed of Flathead Lake were utilized for log storage, saw mill tramways, and lumber shipping docks".

19. It is true, as plaintiffs state, that the circulars referred specifically to the Villa Sites, and we are here concerned with riparian rights of a portion of an allotment made prior to the Villa Sites Act. The patents issued pursuant to the Villa Sites Act, however, contain the same provisions as those under the 1904 Act. Neither made any express reference to riparian rights, and neither contained any reservation or exception with respect to those rights. As set forth in the two letters (note 17), patents issued under both acts were subject to flowage easements for storage of water for irrigation or development of water power, pursuant to the Acts of March 3, 1911 and August 24, 1912.

Plaintiffs also argue that the State of Montana has recognized the Tribes' right to control the bed of Flathead Lake, since on two occasions when the State built bridges crossing Flathead Lake and River it applied for rights-of-way to cross the Lake and River beds and paid damages therefor. Plaintiffs point out also that, although Congress gave the Secretary of the Interior the power to grant rights-of-way across Indian land, it also provided that such grants may not be made across lands of tribes organized under the Indian Reorganization Act "without the consent of the proper tribal officials". 25 U.S.C. §§ 324 and 325. We are not concerned, however, with rights of the State of Montana or with bridges or rights-of-way, but rather with rights acquired by Indians and their grantees through allotments prior to the Indian Reorganization Act of 1934, which terminated the allotment policy.

### (3) Effect of Status of Indian Trust Land

 Plaintiffs' next contend that the federal common law principles are inapplicable because the lands involved are Indian trust lands which have been reserved for the "exclusive use and benefit" of the Tribes. The mere fact that the lands are held in trust does not compel the conclusion that federal common law is not applicable. The beds of navigable waters within the former Territory of Alaska were, according to the rationale of *Shively, supra,* held by the United States in trust for the State of Alaska, (Dalton v. Hazelez, *supra,* 182 F. at 572) and the beds of navigable waters within the District of Columbia are likewise "vested in the United States for the benefit of the people". United States v. Groen, *supra* 72 F.Supp. at 719; Yet, as discussed *supra,* the courts in both instances have recognized the private rights of wharfage and access in riparian proprietors. The fact that the lands were held in trust for In-

dians, therefore, is not in itself compelling, particularly in view of the power of Congress to grant titles which include these rights. The Federal Government in any event holds title, and it is federal law that applies.

It is true, as plaintiffs point out, that Article II of the Hellgate Treaty sets apart the Flathead Reservation for "the exclusive use and benefit" of the Tribes. As previously noted, however, the exclusivity of the Reservation has been sharply limited by the allotment of its lands to individual Indians, the provisions that allotted lands could be sold to non-Indians, and the massive settlement of surplus unallotted lands by non-Indians.[20] While the Flathead Reservation continues to exist, and the land within its original exterior boundaries is still Indian country, it would defy reality to hold that the entire Reservation presently exists for "the exclusive use and benefit" of the Tribes.

### (4) Failure to Expressly Grant Riparian Rights

With respect to their final contention —that because riparian rights were not expressly granted by Congress they cannot be implied—plaintiffs raise two fundamental principles of Indian law: (1) Only Congress has the power to abrogate Indian property rights (See Lone Wolf v. Hitchcock, 187 U.S. 553, 565–566, 23 S.Ct. 216, 47 L.Ed. 299 (1903)); and (2) statutes in derogation of Indian property rights, must be narrowly construed. See Menominee Tribe of Indians v. United States, *supra.*

 The court of course recognizes these standards. There can be no question, however, that by means of the General Allotment Acts and the amendments thereto, the Congress expressed an intent to exercise its dominant power over Indian lands by dividing and conveying those lands, including lands riparian to Flathead Lake, in fee to Indians and non-Indians. Moreover, as discussed

---

20. As indicated in note 5, less than half of the Flathead Reservation is now trust land, and members of the Tribes comprise less than 20 per cent of the population living within the exterior boundaries of the Reservation.

previously, the United States Government, decades before the allotment acts were passed, had taken the position that the riparian rights of access and wharfage were property rights, i. e. incidents of ownership of those holding land riparian to navigable waters.[21] In each case in which title to the bed and banks of navigable rivers is held by the Federal Government, the courts have held that riparian owners have the rights of access and wharfage. *Potomac Steamboat Co., supra; Ketchikan Spruce Mills, supra.*

■ Did Congress intend that the fee patents to allottees and purchasers of lakeshore property would include the riparian rights of access and wharfage? In that determination it is of course necessary to consider all of the treaties,[22] statutes and cases cited by the respective parties, as well as the undisputed facts. As the court said in Stevens v. C.I.R., 452 F.2d 741, 744 (9 Cir. 1971), "Federal policy toward particular Indian tribes is often manifested through a combination of general laws, specific acts, treaties, and executive orders. All must be considered in pari materia in ascertaining congressional intent. Kirkwood v. Arenas, 9th Cir. 1957, 243 F.2d 863, 867."

None of the parties have cited, nor has the court found, any case which has considered the precise question here presented, i. e. whether the owners of riparian property on navigable waters, acquired from the United States as trustee for an Indian tribe, have the riparian rights of access and wharfage. Defendants rely in part upon cases in which the courts have applied common law rules in other contexts in determining the rights of allottees and other grantees of Indian lands. In *Rochester, supra*, the court applied the "general rule" which "has its roots in the principle of the common law" in holding that "patents of the United States to lands bordering on navigable waters, in the absence of special circumstances, convey only to high water mark". 127 F.2d at 192.

In Oklahoma v. Texas, 258 U.S. 574, 42 S.Ct. 406, 66 L.Ed. 771 (1922), the Court, dealing with lands once part of an Indian reservation, applied common law doctrine in holding that patents to lands riparian to non-navigable streams convey title to the middle of the stream. In Fontenelle v. Omaha Tribe of Nebraska, 430 F.2d 143 (8 Cir. 1970), the owner of a former Indian allotment sued to quiet title to land formed when the Missouri River receded from its meander line. The court affirmed the district court's application of "the general rule that land added by accretion to tracts which were riparian at the time of the official survey and plat is the property of the riparian owner". *Id.* at 147.

The court agrees with plaintiffs that these and other cases cited by defendants are not precisely in point since they deal with boundaries and accretion, questions usually determined by federal law even where riparian rights are determined by state law. Bonelli Cattle Company v. Arizona, 414 U.S. 313, 94 S. Ct. 517, 523, 38 L.Ed.2d 526 (1973).[23] The cases are significant, however, in that they stand for the propositions that: (1) federal common law is applied to determine the extent of federal grants of Indian land; (2) express Con-

---

21. Dutton v. Strong, 66 U.S. 23, 31, 1 Black 23, 17 L.Ed. 29 (1861) ; Yates v. Milwaukee, 77 U.S. 497, 504 (10 Wall. 497) 19 L.Ed. 984 (1871).

22. Although the court has rejected defendants' contention that riparian rights were implied in the Hellgate Treaty and Treaty of the Upper Missouri, there is nothing in either treaty which would preclude Congress from granting these rights to an Indian allottee and his assigns.

23. *Bonelli* merely reiterates the general rule that the extent of a federal grant on a navigable stream is a federal question demanding the application of federal law, while the nature of the rights of riparian owners in the bed and banks of navigable streams is a state determination. That is because title to the bed and banks of navigable waters is vested in the states upon statehood. Prior to the admission of a state, title to the bed and banks of navigable streams was held in trust by the Federal Government and federal law was determinative of the rights of riparian owners. See, *Potomac Steamboat Co., supra.*

gressional language is not considered a prerequisite to the application of federal common law principles to federal grants of tribal lands; and (3) the fact that Indian land is involved does not necessitate the application of different principles in determining the extent of a ·federal grant.

### Conclusion

Thus, an analysis of the relevant case law firmly establishes two principles:

(1) In all other situations in which the Federal Government holds title to the beds and banks of navigable waters, a fee patent issued by the United States to riparian lands would include the rights of access and wharfage without an express provision in the patent. This was established as early as 1861 in Dutton v. Strong, *supra*, and consistently followed in many subsequent cases.

(2) Where the United States holds title in trust for Indian Tribes, federal common law is applicable to a determination of the extent of a federal grant despite the lack of any express Congressional language to that effect.

▉▉ Given these principles, this court cannot escape the conclusion that Congress must have intended that the fee patents issued pursuant to the Act of April 23, 1904 would include the customary riparian rights of access and wharfage. The fact that Congress did not expressly delineate these rights does not negate their existence. It was not necessary for Congress to specify every incident of ownership which accompanies a patent to lands on an Indian Reservation.

This conclusion is confirmed by the Senate Report on·the Villa Sites Act in 1910 and the circular issued by the Department of the Interior.[24] Certainly, without the rights of access and wharfage, lands riparian to the south half of Flathead Lake would not have been considered as valuable as suggested in the report and circular.

▉▉ It is significant also that for more than half a century the defendants and other riparian owners, with the full knowledge of the Federal Government and ‚the Tribes[25] and without objection from either, expended large sums of money for docks and wharves abutting their lands on the south half of Flathead Lake. Many persons built and maintain homes and business enterprises. Wharves and piers were constructed, boats and ships plied their way through the area, and commerce was carried on.

Now, after more than fifty years of such activity on the Lake, plaintiffs claim that the riparian owners who have constructed piers and wharves beyond the high water mark are trespassers, should be enjoined from further trespass, and be requested to move immediately all buildings and structures beyond the high water mark.[26] To grant this relief in the light of the factual and legal considerations set forth above, would be a grievous injustice to the defendants and others in a similar position.

The court, therefore, concludes that the defendants as owners of lands riparian to the south half of Flathead Lake are entitled as a matter of law to access to the lake. Concomitant with that right of access is the right to wharf out

---

24. The court agrees with plaintiffs that it is the intent of Congress rather than the Department of the Interior which is controlling, but it has long been recognized that the Secretary of the Interior is the executive arm of the Government to execute the declared Congressional policy with the Indians.

25. It is of course clear that there is no statute of limitations, and the doctrine of laches is not applicable. The long recognition of the riparian rights of the defendants and others does suggest, however, that the Department of the Interior assumed a Con-

gressional intent that the patents include riparian rights.

26. Apparently defendants first received official notice of a claim of trespass in May, 1973. There may have been prior informal notice. The letters written by the Commissioner of Indian Affairs, upon which plaintiffs rely, were dated in 1955 and 1959, but as noted *supra*, neither letter expressly considered the question of riparian rights. In any event, there is nothing in the record to suggest any action by the Government or the Tribes prior to May, 1973.

to navigable water. Plaintiffs' motion for summary judgment is therefore denied. Defendants' motion for summary judgment is granted insofar as the existence of the riparian rights of access and wharfage are concerned.[27]

There remains for determination the question of whether any of the structures owned and maintained by the defendants constitute an abuse of their riparian rights. Plaintiffs contend that "at least some of the structures, including a building and a land-fill extending into the Lake, are not of the type permitted and exceed the limits normally held proper for riparian owners". This question cannot be resolved on the basis of the undisputed facts. As to this issue a further hearing will be required.

Defendants will prepare, serve and file a draft of partial summary judgment in conformance with this order.

---

27. In view of this conclusion, it is unnecessary for the purpose of this order to consider the contention of the respective parties with respect to a temporary injunction or the sufficiency of plaintiffs' answer to some of defendants' interrogatories.